## THE STATE v. E. A. BUNTON, Appellant.

### Division Two, February 26, 1926.

1. **EMBEZZLEMENT: Bank Cashier: Conversion of Deposits.** Evidence offered by the State, tending to show that defendant, who was the bank's *alter ego*, withdrew money in excess of thirty dollars from the accounts of several depositors, without their consent and without the consent of the bank, and deposited it to his own account and afterwards used it for purposes of his own, makes a case to go to the jury on a charge of embezzlement.

2. **FAIR TRIAL: General Prejudice.** The record establishes that the defendant, charged with embezzling the moneys of customers deposited in his bank, which is a charge that naturally tends to create prejudice against the accused, was not accorded the fair and impartial trial guaranteed by the letter and spirit of the Constitution and other laws of this State.

3. ————: **Partisan Judge.** The trial judge, sitting in a case in which the defendant is charged with criminal acts which resulted in the failure of a bank and with the embezzlement of moneys deposited in it by his personal customers, should be particularly careful to exhibit a calm, dispassionate, unprejudiced and judicial attitude throughout the trial; and because that judicial attitude was not maintained, but on the contrary undue partisanship was frequently manifested by the trial judge, the judgment is reversed and the cause remanded.

4. ————: ————: **Partiality: Effect of Conversations: Objections.** Both sides should be treated alike in a criminal trial. It is not judicial fairness to allow the State to show the substance and effect of conversations, but require defendant to prove the very language used; nor to sustain objections made by the State, but overrule objections made by defendant upon identical grounds to the same character of examination.

5. **IMPEACHMENT**: Immaterial Issues: Cross-Examination. Witnesses cannot be impeached by showing that their testimony not material to the issues on trial is in fact untrue. But they may be interrogated concerning matters not material to such issues, for the purpose of discrediting their testimony, and the party seeking to discredit them is bound by their answer; and the trial court improperly applies these rules if he denies defendant the right, upon cross-examination, to ask questions of the State's witnesses upon immaterial matters for the purpose of discrediting them.

6. ———: ———: Insolvent Bank: Prior Examination. Where defendant is being tried upon a charge of embezzling the funds of a bank of which he was the sole owner and officer and which was closed by the bank examiner in December, it is error to refuse to permit him to show, upon cross-examination, that the same examiner had examined the bank in the preceding September and had then reported it to be in good condition, where the most of the shortages, which the State's evidence tends to show, occurred prior to September. In such case it is not only proper to permit defendant to show, upon cross-examination of the examiner, that in September the examiner had given the bank a certification of good character, as tending to discredit his testimony that the bank was insolvent when closed by him in December, but also as proof of a circumstance tending to corroborate defendant's testimony that, when the bank closed, it had in its possession notes to cover all his withdrawals from depositors' accounts.

7. **UNFAIR TRIAL**: Impatient Judge: Ruling Before Objections: Threatening Counsel. For the trial judge to impatiently interrupt counsel for defendant in a criminal trial before they conclude questions being propounded to witnesses and before objections have been made by the State, and to curtly deny to them the right to complete the questions, and to warn them that if they persist in such line of inquiry they must take the consequences, and to evince an ill concealed hostility to the accused and a partiality to the State, and thereby to warrant the jury in concluding that the trial judge believes the accused to be guilty and his defense devoid of substantive merit, is to deny to defendant a fair and impartial trial.

Constitutional Law, 12 C. J., Section 1103, p. 1289, n. 51. Criminal Law, 16 C. J., Section 2049, p. 806, n. 6, 7; p. 807, n. 7 New; Section 2093, p. 827, n. 13, 14, 15; Section 2097, p. 830, n. 41; Section 2101, p. 832, n. 77; 17 C. J., Section 3637, p. 297, n. 3, 11 New. Embezzlement, 20 C. J., Section 79, p. 482, n. 39; Section 85, p. 488, n. 71. Witnesses, 40 Cyc., p. 2569, n. 19; p. 2770, n. 35.

Appeal from Andrew Circuit Court.—*Hon. Thomas B. Buckner,* Judge.

REVERSED AND REMANDED.

*S. K. Owen, K. D. Cross* and *Eastin & McNeely* for appellant.

(1)   The State having introduced evidence of a total shortage, defendant had a right to meet it with any evidence which would tend to support his denial of fraudulent intent, by explaining the alleged general shortage, or any part of it, in a manner consistent with his innocence.   State v. Wilcox, 179 S. W. 480; 20 C. J. 491. (2)   The court erred by remarks indicating an attitude of mind on the part of the court adverse to the defendant and calculated to influence the decision against him and placing defendant's counsel at a disadvantage before the jury.   State v. Davis, 217 S. W. 87; State v. Drew, 213 S. W. 106; State v. Jones, 197 S. W. 156.

*Robert W. Otto,* Attorney-General, and *James A. Potter,* Special Assistant Attorney-General, for respondent.

(1)   The defendant admitted using all the money included in his admission, as testified by the witnesses Todd, Duncan, Winters and Shelby, and no evidence was excluded which tended to explain such shortage.   It is not error to reject testimony which does not explain nor modify that portion of his conversation related by witnesses.   State v. Sibley, 207 S. W. 806.   (2)   Neither the remarks by the court nor the conduct of the court during the trial constituted reversible error.   (3)   The record does not show the refusal to permit any legitimate offer of evidence.   The only times when defendant's counsel were forbidden to pursue a line of inquiry was after the court had passed upon the same proposition at least a half dozen times and appellant's counsel had taken their exceptions thereto.   State v. Duestrow, 137 Mo. 44; State v. Teeter, 239 Mo. 483; State v. Jackson, 222 S. W. 746.

BLAIR, J.—Defendant was convicted of embezzlement. The indictment charged the commission of the crime in DeKalb County, within three years prior to February 2, 1923. The case was sent to Andrew County upon change of venue because of alleged prejudice of the inhabitants of DeKalb County. Defendant thereafter filed the statutory affidavit of bias and prejudice and disqualified the regular judge. The first special judge called in failed to appear and hold court for the trial of the case. Hon. Thomas B. Buckner of the Jackson County Court was then called in as special judge and appeared and tried the case.

After several continuances on account of the serious illness of the defendant, who was then over seventy years of age, the case was finally tried in June, 1924. The jury found defendant guilty as charged and fixed his punishment at imprisonment in the penitentiary for a term of three years. Judgment was entered on this verdict and appeal granted therefrom.

This indictment is based upon Section 3327, Revised Statutes 1919, making it an offense, punishable as for larceny, for any officer, agent, clerk, servant or collector of any incorporated company (such person not being under sixteen years of age) to embezzle or convert to his own use, without the consent of his employer, any money, etc., belonging to any other person, which shall have come into his possession or under his care by virtue of such employment.

Defendant was president of the Exchange Bank of DeKalb County at Maysville for several years prior to December 20, 1922, when said bank was closed by the Department of Finance. Said bank was a banking corporation, organized under the laws of this State. Defendant had been connected with the bank for about thirty years as stockholder, director and later as its president. Defendant was the only man connected with said bank until about three months before it was closed. At that time R. E. Shelby became cashier, succeeding Miss Duncan in that position. Prior to that time, three young women

comprised the employees of the bank. These young women had been employed there for a number of years. They had been trained by defendant and followed his directions unquestioningly. Hence, there is considerable basis for the State's contention that this was a "one-man bank."

It appears that defendant was interested in several business enterprises outside of the bank. It seems that he had acquired, in large measure, the confidence of the community. The record discloses a number of instances where substantial sums of money were deposited in the bank upon checking account under agreements with defendant that the bank would pay such depositor rates of interest varying from five and one-half per cent to seven per cent. The prevailing rate seems to have been six per cent. Naturally such attractive interest rates drew money from other banks, brought forth the mouse-eaten miser's hoard and secured the deposit of the widow's insurance money. The defendant denied that he made any agreement that the bank would pay such unusually high rates of interest upon checking accounts. His testimony was that he told depositors, who asked such rates of interest, that the bank would not pay that rate of interest, but that he could handle their money for them and get that rate and that they agreed that he should do so.

The method followed in a number of cases was this: The depositor would bring his money to the bank and deposit it and take a deposit slip showing an unconditional deposit. This would be credited to the customer's account. A pencil check-mark would be entered after such credit to indicate that the money was taken by defendant. Defendant would draw a check, payable to himself, for the amount, showing that the check was to be charged to the depositor. If the check was not drawn, a debit slip was made out showing that defendant got the money. An entry was then made in defendant's account showing the source of the credit to him.

Defendant testified that the money thus taken was loaned by him for the depositor, and notes or other evidence of indebtedness were taken and placed in envelopes

and marked with the name of the depositor from whose account the money was taken. From time to time, as interest would be collected (as defendant contended), it would be credited to the depositor or paid to him in cash. Defendant testified that such depositors authorized him to use their money in this fashion. Every depositor whose money was thus used and who testified in the case, flatly denied having had any agreement or understanding of this sort with the defendant. They testified that the loan was made to the bank itself, and that the agreement was that the bank was to pay the interest.

The fact that the depositor expected a good rate of interest on a deposit, upon which he had the right to check at will, had the natural effect of inducing the depositor to keep as large a balance as possible in his account and made the account quite stable and dependable. The evidence tended to show that, if and when a depositor overdrew his account, defendant would make a deposit to the credit of the account. All of the depositors testified that they had no knowledge that defendant had drawn money from their accounts. The checks or debit slips made by defendant did not show on the pass books of such depositors as chanced to have their bank books balanced. When the depositor's book would be balanced his deposit would be shown, but the withdrawal of the deposit by defendant would not appear and defendant's check or debit slip evidencing such withdrawal would not be delivered to the depositor.

How intelligent clerks and bookkeepers could perform the clerical work in furthering such manipulations without a consciousness of exceedingly questionable, if not dishonest, practices on the part of the defendant, is difficult to understand. They were very likely so under the influence of defendant that they did not dream of questioning his methods or so imbued with such a sense of his rectitude, that they did not suspect him of dishonest motives, which they probably would have attributed to other men in whom they had less confidence.

What became of the money withdrawn from these accounts by defendant is not disclosed by the record, unless defendant's testimony is accepted as the explanation. The money was not found in defendant's account when the crash came. Neither were any notes or other evidence of indebtedness found in the bank to cover such withdrawals. Defendant testified that he loaned the money for the depositors and took notes to cover the same and put such notes in envelopes with the depositors' names on them and that such envelopes and notes were in the bank when Todd, the representative of the Department of Finance, took charge. None of the other employees testified to the existence of any such notes. Todd testified that he did not find them when he took charge and defendant was not able to find them thereafter, although he was allowed the opportunity to examine the files and records and other papers of the bank in the presence of Todd. On cross-examination defendant was unable to give the names of persons to whom he claimed he had loaned depositors' money. Defendant admitted withdrawing the money from depositors' accounts, but, as stated, contended that this was in accordance with an arrangement, flatly denied by the depositors, to use such money for making loans for them. The money was gone—thousands and thousands of dollars of it—and defendant did not have it in his account. He had checked it out of his account and used it for some purpose. It may be that notes purporting to be drawn by solvent persons were actually in the bank when the examiner came along in September. If so, the jury had no evidence before it to show whether such notes were genuine notes or not. The jury may have inferred that such notes were not genuine and were removed from the bank by defendant when the crash appeared to be imminent. There was no evidence upon that point one way or the other.

It appeared that the representative of the Department of Finance went over the accounts and notes of the bank with the defendant and found a shortage exceeding that alleged in the indictment. He and others testified that

defendant said at that time that he could account for a large part of the shortage, but could not account for approximately $35,000 of it. It was also shown that defendant made a statement to the effect that if the bank was closed it meant suicide or the penitentiary for him.

The ultimate facts, which the evidence offered by the State tended to show, were that defendant withdrew money in excess of thirty dollars from the accounts of several depositors without their consent and without the consent of the bank and deposited same to his own account and afterwards used the money for purposes of his own. Such proof made a case to go to the jury on the issue of embezzlement charged in the indictment.

The motion for new trial contained fourteen assignments of error. In his brief in this court defendant makes sixty-five assignments of error. The increased number of assignments made in this court is largely due to the fact that various rulings on the admission and exclusion of evidence in the trial court are separately assigned as error in the brief. The bill of exceptions contains four hundred and fifty typewritten pages and is literally peppered with exceptions and objections made by counsel for defendant. It would be impracticable, if not impossible, to give separate consideration to all of such rulings to which exceptions are noted. In the view we take of the case it will be necessary to notice only one assignment of error. A large portion of defendant's brief is devoted to such assignment.

A careful reading of the record has produced an abiding conviction in our minds that defendant is correct in his contention that he was not accorded that fair and impartial trial guaranteed by the letter and the spirit of the Constitution and laws of our State. A prosecution for the sort of crime here charged naturally tends to create prejudice against the accused. There is always a public clamor for a victim when a bank fails and depositors—often including widows and orphans—lose their money. It is difficult at best to find jurors who can lay aside this natural prejudice and fairly and impartially try the de-

fendant charged with criminal responsibility for acts which have resulted in a bank failure. The trial judge sitting in that sort of case should be particularly careful to exhibit a calm, dispassionate, unprejudiced and judicial attitude throughout the trial.

The judge who tried this case has died since the trial. But respect for the memory of the dead should not deter us in our plain duty to the living. A careful and painstaking study of the record has convinced us that the proper judicial attitude was not exhibited in the trial of this case. On the contrary, undue partisanship was frequently shown by the trial judge. It would require too long to recite all of the instances where this attitude appears. For example, the State was allowed to show the substance and effect of conversations, while the defense was consistently required to prove the very language used in conversations sought to be shown by defendant. Objections made by the State were sustained, while objections made by the defendant upon identical grounds to the same character of examination were overruled, thus indicating partiality.

The rule is that witnesses cannot be impeached by showing that their testimony touching matters not material to the issues on trial is, in fact, untrue. While witnesses may be interrogated concerning matters not material to such issues, for the purpose of discrediting their testimony, the party thus seeking to discredit such witnesses is bound by their answers. The trial judge improperly applied these rules by denying defendant the right, upon cross-examination, even to ask questions of the State's witnesses upon immaterial matters for the purpose of discrediting them.

Defendant was curtly denied the right, upon cross-examination or otherwise, to show that Mr. Todd had examined the bank in September preceding its closing in December and had then reported the bank to be in good condition, although most of the shortages, which the State's evidence tended to prove, occurred prior to September. The defendant contended that, when the bank

was closed, there were notes and other evidence of in-
debtedness in the bank to cover all money he had with-
drawn from depositors' accounts under an agreement he
claimed to have had with such depositors. The fact, if
a fact, that Mr. Todd had given the bank a certificate
of good character in September was not only proper in
cross-examination as tending to discredit the testimony
of Mr. Todd that the bank was insolvent when closed by
him in December, but such proof was proper as a circum-
stance tending to corroborate defendant's testimony that,
when the bank was closed, it had in its possession notes to
cover all withdrawals from depositors' accounts made by
defendant.

R. E. Shelby was a witness for the State. He had
charge of the bank as a representative of the Department
of Finance, after he resigned as cashier on December 9,
1922. Defendant was not permitted, by way of discredit-
ing such witness, to ask him upon cross-examination if
he had not accepted deposits for the bank, when he knew
the bank was in a failing condition. It was the lang-
uage used by the court in ruling and the court's manner
of ruling on this and other points, rather than the question
of the propriety of such rulings, which induces the belief
that defendant was not granted a fair and impartial trial.

The record shows that time and again the trial judge,
before any objection had been made by the State and with
impatience which is apparent even in the typewritten rec-
ord, interrupted defendant's counsel before they could
conclude questions being propounded to witnesses and
curtly denied them the right to complete such questions.
Counsel were warned that, if they persisted in such line
of inquiry, they must take the consequence. Such con-
sequence was doubtless punishment for contempt. It is
apparent that the professional skill and courage of coun-
sel were taxed to the utmost in such instances to get even
a hint of their position into the record.

It is unnecessary to detail all of the incidents appear-
ing in the record which indicate to us that defendant did
not have that fair and impartial trial which the law guar-

antees to one accused of crime. The attitude and conduct of the trial judge, even as they appear in the cold record, evince his illy-concealed hostility to the accused and his partiality to the State and warranted the jury in concluding that the trial judge believed the defendant to be guilty and his defense to be devoid of substantial merit.

In 16 Corpus Juris, 827, it is said: "The judge must be careful, in his conduct of the case, that he says and does nothing in the presence of the jurors while the case is progressing which can be construed to the prejudice either of the prosecution or of accused. It is error for him to express, directly or indirectly, by words or by conduct, in the presence of the jurors, an opinion which discriminates against, or points to, the guilt of accused, or to make a statement which tends to discredit or prejudice accused with the jury."

In State v. Allen, 100 Iowa, 7, l. c. 12, misconduct on the part of a trial judge was under consideration. While the conduct of the trial judge in that case finds no parallel in the record before us, the remarks of the Supreme Court of Iowa relative to the influence of the trial judge upon the minds of the jurors well state the reasons why trial judges should be meticulous in their attitude and conduct during the course of the trial, lest the jury be unduly influenced thereby. KINNE, J., said:

"It must be remembered that jurors watch courts closely, and place great reliance on what a trial judge says and does. They are quick to perceive the leaning of the court. They are prompt to notice the inclination, even, of the court, and from his conduct, whether properly or not, they will almost invariably arrive at a conclusion as to what the court thinks about the case. Every remark dropped by the court, every act done by him during the progress of the trial, is the subject of comment and conclusion by jurymen. Hence it is that judges presiding at trials should be exceedingly discreet in what they say and do in the presence of a jury, lest they seem to lean towards or lend their influence to one side or the other."

It may be that the defendant is guilty of the crime of embezzlement. It may be that he would be convicted by any jury in a trial where the fairness and impartiality of the trial judge could not be questioned. But that is not the criterion. Guilty or innocent, the defendant was entitled to be tried fairly and impartially. We are thoroughly convinced that defendant did not have that character of trial.

There are numerous questions in the case which we will not undertake to consider. A retrial should eliminate most of them from necessity of future consideration. For the sole reason that it is plainly apparent from the whole record that defendant did not have that fair and impartial trial to which every person on trial for a criminal offense is entitled, the judgment should be reversed and the cause remanded for another trial. It is so ordered. All concur.