THE STATE v. LOREN BAUBLITS, Appellant.—27 S. W. (2d) 16.

Division Two, April 7, 1930.

1200

*A. F. Harvey, DuBois & Miller* and *Shinabargar, Blagg & Liven-good* for appellant.

*Stratton Shartel*, Attorney-General, and *A. M. Meyer*, Assistant Attorney-General, for respondent; *L. Cunningham* of Counsel.

DAVIS, C.—Defendant was charged with killing Henry Burchett on January 22, 1928, in Nodaway County. He was afforded a preliminary hearing and waived .it. Thereupon the prosecuting attorney filed an information in the circuit court charging him with murder in the second degree. After a continuance given him, defendant was granted, upon application, a change of venue. The cause was sent to Gentry County for trial. On a trial there to a jury he was convicted of manslaughter and his punishment assessed at seven years in the penitentiary. The trial court overruled his

motion for a new trial, and entered judgment on the verdict. He appealed.

The evidence adduced on the part of the State warrants the finding that defendant at the date of the trial in December, 1928, was a man thirty-six years of age. In October, 1927, he was appointed a state deputy game warden. On Sunday, January 22, 1928, pursuant to information conveyed to him that men were hunting quail in the vicinity of Bethany Church in Nodaway County, he proceeded thither in company with Deputy Sheriff Burchett, a cousin of the deceased. Defendant drove his automobile, and they arrived at the church around two o'clock in the afternoon.

The deceased, Henry Burchett, was forty-seven years of age and weighed one hundred and ninety pounds or more. He was in good health, but more or less deaf. He resided in the city of St. Joseph, and operated a newspaper route. Before nine o'clock A. M. on January 22, 1928, in company with his son, Gordon Burchett, and companions, Allen Lofton, G. A. Johnson and Hix Glass, all residents of St. Joseph, he left that city, driving his Chevrolet car, and went to the neighborhood of the Bethany Church in Nodaway County to hunt. Deceased and his companions hunted in that neighborhood during the forenoon, and about twelve-thirty P. M. they went to the immediate vicinity of Bethany Church, where they hunted for a half hour or more, firing fifteen or twenty shots prior to the appearance of defendant and the deputy sheriff. The deceased and his companions were then hunting on property immediately across the road from the church. Defendant first parked his car and then approached two boys, who were idling in the cemetery adjoining the church, and conversed with them. Defendant and the deputy sheriff then approached Lofton and Johnson, and requested the examination of their hunting licenses. It took, according to the evidence, two or three minutes to examine them. The deceased was then probably fifty yards from them. Apparently he had not noticed the officers, for he did not look towards them or pay attention to them. He was then walking in a northeasterly direction at a fast pace or a slow trot toward a wheat field and a thicket. He carried his shotgun in his right hand, with a sack containing five or six rabbits hung from his shoulder. Gordon Burchett was then thirty or forty feet to the south, near the road fence. The defendant, observing the deceased, halloed "Hey" or "Stop" a few times. The last time he said "Hey" he pulled his pistol, which was a 32-calibre long Smith and Wesson police positive revolver, and fired in the air.

Lofton testified: "Well, he crossed the ditch and hollered a couple of times, and crossed the ditch and shot into the air, and then he kind of slowed down when he shot the first time, and then ran up a little farther and drawed down about like that, and took

particular aim the second shot, and then, of course, he stopped every time he would shoot, and then moved up and he took the third shot.'' Defendant was then one hundred and sixty yards from the deceased when he fired the third shot. He held the gun with both hands with a wrist support for the second shot, which struck the ground a little behind the deceased. The deceased did not stop, turn around or look back, but kept going in the same manner in the northeasterly direction, at a fast walk or trot. The defendant, on the third shot, held the gun with both hands or supported it by his wrist, and shot in a direct angle with the deceased, who was on ground about thirty-five feet above him. Deceased fell. The land sloped gradually. The defendant and deputy sheriff then took Gordon Burchett, put him in front of them, and circled around to where the deceased was lying. The defendant directed them not to rush up, saying that he did not hurt him, that he was possuming on him. The defendant turned the deceased over on his back, hunting for bullet wounds in his chest. Lofton said, ''You had better be getting a doctor instead of hunting bullet wounds on a man's chest when you know you shot him in the back.'' The defendant went to the deputy sheriff who covered the hunters with his revolver and disarmed them. Defendant said to the deputy sheriff, ''I think everything is justified.'' The deputy sheriff replied, ''I don't know.'' Defendant then told Lofton that he could get a doctor. On searching the deceased they found a 1927 hunting license, but no license for the year 1928.

Witness Johnson said as to the third shot that defendant moved over a little and then leveled down and shot again, and deceased fell. Gordon Burchett testified that he heard one shot only. Immediately prior to defendant shooting his father, the defendant asked the deputy sheriff the question, ''Shall I shoot to kill or shoot to cripple?'' and the deputy replied, ''Do as you like.'' He said defendant took steady aim and shot. The deputy sheriff said that defendant asked him between the second and third shots, ''What shall I do? Shall I crack down on him?'' and he replied, ''Use your own judgment.'' The sheriff said the defendant said to him after the killing, in answer to the question, ''How did you happen to shoot this man?'' ''Well, I hollered to him to stop, and he didn't stop, and I had shot a couple of times in the air, and I thought he was going to turn around, and I took a little better aim on the next shot.'' Deputy Sheriff Rasco, relating the conversation, said that defendant said, ''Well, I shot a couple of times in the air and it seemed like he didn't pay any attention to it, and I thought I would crack down on him and I hit him. Seemed like he went to turn around about the time I shot at him, and I didn't know but what he was going to shoot at me or something, and I just cracked down on him.''

The witnesses for the State about two weeks after the killing measured the distance between defendant and deceased at the third shot, and put it at one hundred and sixty yards. The evidence tends to show that the bullet struck the deceased in the back, first ranging to the left and then to the right, and lodged under the skin about an inch above where it went in. It cut the great aorta artery. The result was immediately fatal. The State's evidence further tends to show that deceased was walking erect at the time he was shot.

The evidence for defendant tends to show that deceased was 38.3 feet above him at the time of the third shot; that the distance between them was 558 feet. He did not notice that deceased was partially deaf.

The defendant personally testified that he was single and lived with his father and mother. He arrived in the neighborhood about two o'clock P. M. He said it took a minute or two to examine the licenses of Lofton and Johnson. The deceased was then going northeast. Defendant ran and halloed "Hey" twice, then fired in the air. He moved ninety or a hundred feet. After the first shot he continued to run and halloed. When he fired the second shot, the deceased was slowly running. He fired the first and second shots practically straight up. After the second shot, the deceased began to run fast and increased his speed, continuing in the same direction. He fired the third shot practically straight up. He was merely trying to attract the attention of deceased to examine his license. The deceased paid no attention, at all and never slackened his speed or turned around. Defendant had no intention of hitting him. The deputy sheriff was going toward Gordon Burchett when defendant fired the third shot. Defendant said to Burchett, "Don't crack down on him, Frank." He denied saying, "Shall I shoot to cripple or shoot to kill?" or anything like that. He said that he halloed, "Stop." On starting to go to deceased, he said to the deputy sheriff, "Don't go up there, Frank, I never shot him; he is playing possum." He denied saying to the deputy sheriff that everything was justified, and denied that the deputy sheriff answered, "I don't know." He said that he did not point the gun at deceased, but pointed it in the air, and did not intend to hit him. He admitted a conversation with the sheriff, saying that he said, "I was running across there and fired all three shots in the air, and the third one accidentally hit him." To which the sheriff replied. "That is what the rest of them said." He denied a conversation in the presence of Deputy Sheriff Rasco, and denied that he made the statement that he took better aim the third shot. He said that he did not know whether the deceased knew that defendant was there. He had not tried to arrest him. Defendant said that he intentionally pulled the trigger, and there was no accidental discharge of the revolver. He

did not tell the deceased that he was a game warden, or converse with him about discharging firearms in the vicinity of the church, or about shooting quail, or about being called down there, or about hunting on Sunday. The deceased did not look back at him at any time. When he fired the third shot, the deceased fell on his face and threw his gun from him. The defendant also offered evidence as to his good character. Other facts pertinent to the issues raised will be found in the opinion.

I. The verdict of the jury, omitting caption and signature of the foreman, reads: "We, the jury in the above entitled cause, find the defendant guilty of manslaughter and assess his punishment at ▬▬▬▬ (7) seven years in the State Penitentiary." Defendant challenges it on the ground that, as the information charges murder in the second degree and an intentional killing, the verdict of manslaughter is special, thus requiring a finding of the constituent elements of the crime, which include culpable negligence.

Pursuant to the killing of a human being, the perpetrator of the deed, under our statutes, is guilty of murder in the first degree, or murder in the second degree, or manslaughter, provided always that justifiable or excusable homicide or self-defense was not present. The three classifications constitute the law of the case. The submission of the three degrees to the consideration of the jury is required where the facts justify them. A verdict finding a defendant guilty as charged in the information is general and ordinarily sufficient. But where the whole evidence, on a charge of first degree murder, justifies the submission of all the law of the case, which includes first and second degree murder and manslaughter, then a verdict finding defendant guilty of murder in the first degree, or murder in the second degree, or manslaughter, respectively, as the finding may be, is sufficient. Such verdict is general and is necessary to protect a defendant in his rights and to render the trial fair. Such verdicts, as far as we can find, have always been held sufficient in this State. [State v. Adams, 316 Mo. 157, 289 S. W. 948; State v. Lloyd, 263 S. W. 212; State v. Likens, 231 S. W. 578.] In State v. Bird, 286 Mo. 593, 228 S. W. 751, where the charge was murder in the first degree, this court said, l. c. 600: "The words in the verdict, 'guilty of manslaughter,' were a full and complete finding of the issue submitted." In Carrick v. State, 18 Ind. 409, it was held that a verdict for manslaughter, under an indictment for murder, need not show a state of facts constituting manslaughter. [30 C. J. 426.] The verdict of manslaughter is responsive, no matter whether the jury found the act of defendant was intentional without malice or the result of culpable negligence. The contentions are overruled.

1208

II. It is said that the trial court erred in permitting the State's witness, the widow of the deceased, to detail the number and ages of their children. As it is necessary to reverse the judgment and remand the cause on another ground, we need not hold that the evidence constituted prejudicial error; but we do hold that the evidence was irrelevant to any issue in the case and should not have been admitted.

III. The court struck out the testimony of Ira Munsey, defendant's witness, to the effect that, about ten days prior to the killing, the deceased, in relation to a hunting license, with a shot gun lying across his arm, said: "That is all the license I need right now." And, patting his gun, further said: "Some s-o-b- will get the contents of both of them before he gets me." Neither this conversation nor its import was ever communicated to defendant.

(a) The first charge of error is: "Uncommunicated threats are admissible to throw light on the conduct of deceased." Defendant cites State v. Burns, 278 Mo. 441, 213 S. W. 114, and State v. Edwards, 203 Mo. 528, 102 S. W. 520, to support his contention. However, they are not apposite. As the evidence did not show an affray or threatening attitude on the part of deceased, it was not admissible, for self-defense was not involved. [State v. Ilgenfritz, 263 Mo. 615, 173 S. W. 1041.]

(b) The second charge reads: "The conversation was admissible for the purpose of impeaching Lofton, a State's witness." The witness denied that deceased made the statement related above. The defendant objected to striking out the evidence on the ground that it tended to impeach Lofton. In view of the fact that the record contains no evidence that defendant was acting in self-defense, it was immaterial whether deceased uttered the words or made a threat. The utterance of the threat would not have tended to throw light on the actions of defendant, or to prove or disprove guilt. The matter was collateral. The test of the materiality of the evidence is its competency if sought to be proved by the cross-examining party in establishing his case. This is not a case where the court denied the defendant the right to impeach by cross-examination the State's witness. That right obtained even upon matters immaterial. But, when that right has been accorded a defendant, he is bound by the answer of the witness, and he cannot impeach the witness as to collateral or immaterial matters by evidence aliunde. [State v. Bunton, 312 Mo. 655, 280 S. W. 1040; Maurizi v. Western Coal & Mining Co., 11 S. W. (2d) 268; State v. Cox, 263 S. W. 215.]

IV. It is charged that the court erred in sustaining objections to evidence and an offer of proof relative to experiments made by defendant's experts tending to show that it was a physical impossibility for defendant to shoot and kill deceased with the pistol fired by him at a distance of 558 feet and an elevation of 38.4 feet by sighting and pointing the pistol directly at him, as testified to by the State's witnesses, Lofton, Johnson, Burchett and Weston; that the experiment developed that the only way the pistol would carry that distance was by elevating it at a high angle; that to hit a man at that distance would be a mere accident; that the experiments would show that the killing of deceased under the circumstances was not a culpably negligent act, but that it was accidental and without criminal intent. The offer of proof was that two army men, experts in shooting, at the distance and elevation of 558 feet and 38.4 feet, respectively, shot fifty times at a target the size of a man and failed to hit it, and that it was a physical impossibility to hit the target at that distance by holding the pistol directly pointed at it; that the pistol would not shoot with any degree of accuracy at more than fifty yards.

The evidence of Lofton was that, on the second shot, the defendant held the pistol with a wrist support, the bullet striking just behind deceased. On the third shot, defendant again took a wrist support and held the pistol at a direct angle with deceased. Johnson testified that he leveled down and shot. Burchett testified that he took steady aim and shot. Weston testified that the first two shots were fired at an angle of a little over forty-five degrees and as to the third shot, he said, "It was lowered somewhat than on the first two shots."

The rules regarding the admissibility of experimental evidence may be found in State v. Bass, 251 Mo. 107, 157 S. W. 782, and 16 Corpus Juris, 563. In our opinion, the evidence would not have assisted the jury in reaching a proper verdict. It would have tended to confuse the jury rather than have aided it. While Lofton testified that defendant held the pistol on deceased at a direct angle, nevertheless the general import of the State's evidence was defendant held the pistol at an angle that permitted the bullet to strike deceased. Be that as it may, the bullet hit and killed Burchett. The evidence would not have tended to establish or to disprove a material issue. It would have tended to show nothing more than that the bullets did not hit the target. It would not have tended to show that, by holding the pistol at the angle at which defendant held it when he fired the third shot, the bullet could not and did not strike deceased. The facts and circumstances in evidence tend to show culpable negligence.

V. We need not discuss in detail the assignment of error that the court erred in permitting the State to persistently cross-examine the defendant, for there is no merit in it. Most of the evidence as to matters complained of came in without an objection from defendant. The other questions comprised legitimate cross-examination. However, in any phase of the case, that defendant had the pistol in his possession when notified that parties were hunting in the neighborhood of Bethany Church was not prejudicial, for, as deputy game warden, he was authorized to carry it.

VI. The deputy sheriff, witness for the State, testified that defendant, just prior to firing the third shot, asked him, "What shall I do? Shall I crack down on him?" On cross-examination witness was asked whether defendant referred to deceased or the boy. Witness replied, "I don't know who he referred to." Then the record shows: "Q. Then you don't know which one he meant with the statement about 'cracking down,' do you? A. No, I don't.

"MR. WRIGHT: I do.

"MR. LIVENGOOD: I suggest that that is improper. We heard Mr. Wright over here say, 'I do.'

"THE COURT: Yes, counsel will be very careful about that.

"MR. GIBBANY: I heard it right over here.

"MR. LIVENGOOD: We heard it clear over here.

"THE COURT: Proceed.

"To which the defendant then and there excepted and still excepts."

If defendant made an objection, then the action of the court was a reprimand of counsel for the State; and, as defendant asked no further action, the trial court ought not to be convicted of error as to the occurrence.

VII. Instruction 4a is attacked. This instruction involves voluntary statements made by defendant and is identical with that recited in State v. Hamilton, 304 Mo. 19, 263 S. W. 127. While we criticised the instruction in State v. Hersh, 296 S. W. 433, and State v. Hall, 7 S. W. (2d) 1001, nevertheless the instruction was again considered in State v. Eason, 18 S. W. (2d) 71, with State v. Hersh and State v. Hall in mind, and we reaffirmed the ruling in State v. Hamilton, supra. Consequently, the contention of defendant is overruled.

VIII. Defendant complains of Instruction 6. This instruction involved murder in the second degree. As defendant was convicted

of manslaughter, he is in no position to complain of an instruction on murder in the second degree, as it is evident he was not prejudiced by it. [State v. Darling, 199 Mo. 168, 97 S. W. 592; State v. Porter, 276 Mo. 387, 207 S. W. 774; State v. Young, 314 Mo. 612, 286 S. W. 29.]

IX. Instruction 10 comprises five paragraphs. It involves culpable negligence and authorizes the jury to convict defendant of manslaughter. The paragraph defining culpable negligence, of which defendant complains, reads:

"Criminal or culpable negligence within the meaning of the law, is the omission on the part of a person to do some act under any circumstances which an ordinarily careful or prudent man would do under like circumstances, or the doing of some act, under any circumstances, which an ordinarily careful or prudent man under like circumstances would not do, and by reason of which omission or action another person is endangered in life or bodily safety."

This definition is practically identical with the definition of culpable negligence set forth in State v. Weisman, 256 S. W. 740. In State v. Millin, 300 S. W. 694, in discussing culpable negligence, BLAIR, J., relative to the definition of culpable negligence in State v. Weisman, said, l. c. 697: "But it seems to us that even the definition of culpable negligence quoted by us from State v. Weisman does not properly and fully define culpable negligence. That definition is nothing more than a definition of ordinary negligence, with only the additional requirement that the life or limb of another be directly endangered thereby."

There is a marked distinction between simple or ordinary negligence, giving one a right of action for damages, and culpable negligence, rendering one guilty of a criminal offense. Culpable negligence is tantamount to gross carelessness or recklessness incompatible with a proper regard for human life. We do not think that the definition of culpable negligence found in Instruction 10, supra, is sufficient. While it says that culpable negligence must be such as to endanger the life or bodily safety of another, that is not sufficient to comprehend gross carelessness or recklessness incompatible with a proper regard for human life. One may endanger the life or bodily safety of another through ordinary negligence only, but that degree of negligence is not sufficient to render one criminally responsible.

In Cannon v. State, 107 So. (Fla.) 360, l. c. 363, on an indictment for manslaughter, the court condemned instructions defining culpable negligence, which definitions were tantamount to simple

1212

negligence. The court said: "But, to authorize a recovery of exemplary or punitive damages, the negligence complained of must be of 'a gross and flagrant character, evincing reckless disregard of human life, or the safety of the persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.' . . . This definition of the character of negligence necessary to be shown to authorize the recovery of punitive damages may well be applied as a definition of 'culpable negligence' as used in the statute (Section 5039) defining manslaughter." [See also State v. Murphy, 324 Mo. 183, 23 S. W. (2d) 136.]

Instruction 10 did not properly define culpable negligence, and we think it constituted prejudicial error.

We think it unnecessary to discuss the other assignments of error. However, because of the error appearing in Instruction 10, the judgment is reversed and the cause remanded. *Henwood* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. *Blair, P. J.,* and *White, J.,* concur; *Walker, J.,* absent.