STATE of Missouri, Respondent,

v.

James Alfred TURNER, Appellant.

No. 46808.

Supreme Court of Missouri,
Division No. 2.

Feb. 9, 1959.

Ben J. Weinberger, St. Louis, for appellant.

John M. Dalton, Atty. Gen., J. Richard Roberts, Sp. Asst. Atty. Gen., for respondent.

EAGER, Judge.

Defendant was convicted by a jury of Robbery in the First Degree By Means of a Dangerous and Deadly Weapon (Section 560.135 RSMo 1949, V.A.M.S.), and was sentenced to a term of twelve years in the penitentiary. The jury found him not guilty of any prior felony, although sentences, confinements, and discharges for two prior felonies were admitted in open court by his counsel. This is the privilege of a jury under our existing law (Section 556.280 RSMo 1949, V.A.M.S.), anomalous though it may seem. After pursuing an unsuccessful motion for a new trial, defendant appealed. The case is briefed here only by the respondent, so we shall consider the matters sufficiently raised in defendant's motion for a new trial, and those matters of record which we would consider in any event.

The State's evidence fairly showed the facts which we shall now relate. Arthur Perry, accompanied by one Helen Floyd, drove to the vicinity of 19th and Franklin Streets in the City of St. Louis between 12:15 and 12:30 a. m. on June 23, 1957; he parked on Franklin, near the corner, headed west. The car was a two-door 1957 Chevrolet. The purpose of the stop was to permit Helen Floyd to buy a "barbecued snout" from a stand near the intersection. The car was parked very near a street light, and its front windows were down. After Helen Floyd left the car, with Perry sitting under its wheel, a man walked up to the door on the opposite side, took something out from under his shirt and "pressed himself" up against the door; as he did so, he bent over somewhat, and pointed a blue steel pistol at Perry, saying, "Give me your money." Perry protested that he had only two or three dollars, but the command was repeated; thereupon, acccording to Perry's comment (unobjected to), he "knew that man meant business, so I said, 'Okay.'" Perry then gave the man his billfold, containing $5, asking for his "pocketbook back." The man also looked in the glove compartment, and then told Perry twice to "pull off." As Perry began to comply, Helen Floyd was heading back to the car, and she heard the second such direction; she walked up to the man and said: "Well, what did you tell him to drive off for?" The man turned quickly, looking "startled," threw the billfold into the street, and started to run. Helen followed, running as best she could, and "yelling and hollering," until the man entered an alley which ran between Franklin and the next street north. The robbery occurred at approximately 12:30 a. m. Perry, Helen, one Joe Cosby and perhaps others, then congregated on the intersection and the police were called.

Cosby, who had been leaning on the railing of a second-floor porch at the entrance of the alley, testified that he saw the man run almost directly beneath the porch; he had been attracted by the commotion, and first saw the man when he was 45–50 yards away. He further testified: that there was a street light directly across from his porch, at a height almost even with it, and that he recognized the running man as one whom he had seen many times around the neighborhood; that this man always wore a baseball cap, and "most of the time he wore that little shirt"; also, that he knew where the man lived. These witnesses testified that the man in question was wearing his shirt outside his trousers, and a dark baseball cap, probably dark blue. Perry and Helen testified that his shirt was dirty. Cosby pointed out to the police the abode of the man whom he had seen running. Some or all of

these parties were taken to the police station to make a report; very shortly, however, the police went to the room or apartment where defendant lived; they found him there with three other persons and wearing only trousers. On a chair were a dirty white shirt and a blue baseball cap; he was told by an officer to put these on, and he did. Perry then identified him as the robber. Later Helen Floyd and Cosby identified him as such at the police station, and at the trial all three positively identified defendant as the robber. The evidence fairly showed that Perry and Helen each had an opportunity to look at the man's face rather closely. Perry testified that the robber was "brown skinned" and of medium height; Helen testified that he had a moustache.

■ Defendant's counsel conducted extended cross-examinations of the State's three principal witnesses. He was permitted to show, at length, the domestic affairs and relationships of Perry and Helen, respectively. The essence of this evidence was: that Perry, although married and having grown children, had been going with Helen as his "girl friend" for several years; that she had been married twice and divorced twice, having had children by each husband, and that she was pregnant by Perry at the time of the robbery; that Perry's child was born to her, the date being shown, and that Perry was contributing to its support. There was also much cross-examination concerning Perry's earnings, his disposition of the money, and of relief payments to Helen. All this was permitted on counsel's theory of attacking the credibility of the witnesses.

Defendant did not testify. Six witnesses testified for him: that he spent the day immediately prior to the robbery and that entire evening helping his sister, Evelyn Tanner, and her husband move; that various persons were engaged in that endeavor and that several of them (specifically including the defendant) concluded the enterprise by sitting in the new abode from about mid-night to approximately 1:15 a. m. (June 23, 1957), talking, watching television, drinking beer and eating "snacks," until the host finally delivered them to their homes or to other desired locations. According to this testimony, the defendant and a woman whose name was Idabelle Maupins were dropped out at a sort of confectionery and liquor store several blocks from his abode. This, as nearly as we can tell, was said to have been at approximately 1:15 a. m.; from thence he and Idabelle walked to his place, and, as he was starting to "wash up," a few minutes later, the police arrived. It is obvious that if the foregoing evidence had been believed by the jury, defendant could not have been convicted. There was also evidence that the police, although requested to do so, did not interview defendant's sister and brother-in-law.

The first assignment in defendant's motion for new trial concerns the argument of the Assistant Circuit Attorney. In the portion complained of counsel said, in substance, that crime was prevalent in St. Louis, that robbery was a heinous form of crime, that the jury should acquit the innocent and convict the guilty, that no one likes to send a man to the penitentiary, but that such a duty sometimes becomes necessary; also, that a conviction would be an example to others and would also show such persons that they could not "ridicule and badger" the State's witnesses. These statements were made in the State's final argument. Complaint is also made that counsel referred to the previous convictions of defendant as being "the same" as the present crime, thus allegedly misleading the jury. At least two objections were sustained to parts of this argument and counsel then asked no further relief. As to the "ridiculing and badgering" of witnesses the court ruled that such was a legitimate argument; we agree that it constituted merely a fair, if partisan, interpretation of counsel's cross-examinations and of the defense argument. In that argument defendant's counsel referred to

Perry nine times as "lover boy," and to Helen Floyd several times as a "slick chick"; also, to Helen as a "woman with the big belly * * * running," and as "child-aid Helen Floyd * * *." If counsel persist in baring the inner lives and souls of witnesses upon cross-examination upon a collateral matter and in order to attack their credibility (though legally permissible), and thereafter they conduct such an argument as is here shown, they may expect some degree of retribution. The retort here was surprisingly mild, and well within the bounds of legitimate argument.

■■ It has been held many times that a prosecutor may legitimately argue the necessity of law enforcement as a crime deterrent and that the "responsibility for the suppression of crime * * * rests upon trial juries." State v. Laster, Banc, 365 Mo. 1076, 293 S.W.2d 300, 306, certiorari denied Laster v. State, 352 U.S. 936, 77 S.Ct. 237, 1 L.Ed.2d 167, and cases cited. Here counsel fairly related his request for a conviction to a finding of guilt, saying, "You are selected * * * to acquit the innocent and to convict the guilty." Included in this assignment is a claim of error in permitting the Assistant Circuit Attorney to state that the crimes for which defendant had previously been convicted were "the same" as that on trial; this is without merit. The records of the prior offenses were stipulated, the precise charges having been stated in open court. The jury could not have been mislead. Moreover, when the State's attorney said, " * * * later the same thing has happened," and counsel objected, volubly explaining his position before the jury, the court stated that perhaps the statement of counsel was "a little too misleading"; the State's counsel then rephrased that entire statement without further objection. We find no error in any rulings upon the argument.

■ Several assignments in the motion attack the conduct of the trial judge; we shall consider these collectively. Therein it is alleged: that he demonstrated bias and prejudice against defendant and his counsel, that he inflamed the jury against the defendant by reprimanding counsel for defendant, by threatening him with contempt in a loud and angry manner, by his manner in ruling upon evidence, and by showing approval of the State's witnesses and disapproval of defendant's; that he permitted the State's attorney to harass defendant's witnesses, allowed him greater latitude, and showed partiality; in permitting the trial to proceed after he had aroused prejudice, and in refusing to disqualify himself. We have examined the entire transcript with these complaints in mind. We find that the trial court exercised a very commendable patience, and that he permitted great latitude to defense counsel; nor did the State's counsel "harass" any defense witnesses at any time. The court did not, as alleged, "discredit" any of defendant's witnesses. It is impossible to discuss the record in detail on these assignments, largely for the reason that they are not alleged as specifically as is contemplated under our Rule. We find no demonstrated prejudice on the part of the trial court. It is alleged, more or less specifically, that the court erred in failing to declare a mistrial, as requested, when it had demonstrated its prejudice by rebuking counsel when such action was wholly unjustified. The occurrence took place immediately after Helen Floyd had referred to some act of the robber as consuming a "few minutes" when it obviously had not, in fact, taken so long; counsel offered her his watch, apparently for the purpose of having her make an experiment or demonstration of her judgment on the passage of time. The State objected that the witness need not submit "to this kind of examination," counsel for defendant insisted that she did, and the court said, "No, she doesn't. (To the witness) Give the watch back." Thereupon counsel, in the presence of the jury, objected to the court's manner, demeanor and feelings, and asked for a mistrial. This was denied "in view of the way you have been conducting your cross-

examination." Objection was then made at length to these "remarks," and the objection included the assertion by counsel that defendant was being deprived of a fair and impartial trial and that the remarks tended "to browbeat the defendant or his counsel * * *." The objection was overruled and the court told counsel that the next time he made an objection like that he should make it at the bench. At that point counsel suggested that the court disqualify himself and asked for a mistrial. We cannot consider this exchange as standing wholly alone; counsel had cross-examined Perry and Helen Floyd at great length and in minute detail; parts of this concerned matters of doubtful materiality, and parts were repetitious. So far as the watch incident was concerned, we think that it was well within the discretionary power of the trial court to refuse to permit the demonstration. The court is invested with much discretion, and necessarily so, in determining the extent of cross-examination. State v. Montgomery, Mo., 223 S.W.2d 463. As concerns the demeanor of the court at the time, nothing is shown in the record which indicates misconduct or any abuse of discretion; moreover, we are all human, and it would be only natural that some slight degree of impatience might occasionally be displayed under such circumstances. Certainly the court did nothing and said nothing here which might possibly indicate its belief that the defendant was guilty. It was its duty to maintain decorum and an orderly mode of procedure. Reference is made in the assignment to a threat of punishment for contempt. We find no such threat in the record. Two affidavits filed here state that the court did so threaten counsel in a harsh manner during the cross-examination of Helen Floyd. We are not disposed here to go outside of the official record; if such a thing occurred we may not assume or speculate upon the circumstances; and if it occurred, the circumstances may have justified the action. State v. Montgomery, Mo., 223 S.W.2d 463. We find nothing which necessitated a mistrial or a disqualification, and we further find nothing in the record to sustain the assertion of misconduct, generally or specifically, prejudicial to the defendant or his cause. See, generally, State v. Barnholtz, Mo., 287 S.W.2d 808.

The assignment that the court abused its discretion in curtailing defendant's right of cross-examination of the witnesses Perry, Floyd, and Cosby is wholly insufficient under our Rule 27.20, 42 V.A.M.S. These cross-examinations comprise approximately 130 pages of the transcript and no offending instances are pointed out. If anything needed to be said on the merits, however, our previous rulings would be sufficient.

■ Several assignments constitute, collectively, the contention that the State's evidence was insufficient for conviction and that defendant's motion for acquittal should have been sustained. The only supposed deficiency specified is actually only an argument to the effect that the evidence of defendant's identity was "highly improbable and almost impossible." The evidence of defendant's identity here was unusually clear and positive. The effect, weight and credibility of this and other evidence were solely for the jury. There was ample and substantial evidence to sustain the State's case. See State v. Smith, Mo., 298 S.W.2d 354, and cases cited. The contention is denied.

■ It is contended that Instruction No. 5 was erroneous. Its concluding paragraph was as follows: "If, upon consideration of all the evidence, you have a reasonable doubt of the defendant's guilt, you should acquit; but a doubt to authorize an acquittal on that ground, ought to be a substantial doubt touching the defendant's guilt, and not a mere possibility of defendant's innocence." The contention seems to be that the last eight words quoted tended to limit and minimize the presumption of innocence, which had already been fully covered. In referring to identical language in State v. Stogsdill, 324 Mo. 105, 23 S.W.

2d 22, loc. cit. 26, this court said: "* * * the instruction on reasonable doubt with that qualification has been so long and so often approved by this court that it is needless to cite cases in support of it. * * *" See, also, State v. Berry, Mo., 237 S.W.2d 91; State v. Abbott, Mo., 245 S.W.2d 876. The contention is disallowed.

An assignment is also made of error in Instruction No. 6 on the credibility of witnesses. That instruction was as follows: "You are further instructed that you are the sole judges of the credibility of the witnesses and of the weight to be given to their testimony. In determining such credibility and weight you may take into consideration the demeanor of the witness, his or her manner on the stand, his or her interest, if any, in the result of the trial, his or her relation to or feeling towards the defendant or any sworn witness testifying in the case; the probability or improbability of his or her statements, as well as all the facts and circumstances given in evidence." It is here urged that the instruction constituted a "vicious comment" upon the nature and character of defendant's testimony and witnesses and that it singled them out, because they were "related to him by blood or closely associated to his family." To a great extent the giving of instructions on the credibility of witnesses lies within the discretion of the trial court. State v. Hart, 331 Mo. 650, 56 S.W.2d 592. Some guide on this subject is particularly appropriate where there is such a sharp conflict in the evidence as there is here. It is proper in an appropriate case to instruct generally upon the interest of witnesses in the result of a trial. State v. Caviness, 326 Mo. 992, 33 S.W.2d 940, 943; 53 Am.Jur., Trial, § 776, p. 577; § 781, p. 580; 58 Am.Jur., Witnesses, § 865, pp. 493–494; §§ 866, 867, pp. 495–497. The interest of a witness "and his relation to or feeling toward a party are never irrelevant matters * * *." State v. Pigques, Mo., 310 S.W.2d 942, 947. In civil suits the courts have many times

approved instructions on credibility which permit the jury to consider, as to any witness "* * * his or her interest, if any, in the result of the trial, his or her relation to or feeling towards the parties to the suit * * *." Lukitsch v. St. Louis Public Service Co., 362 Mo. 1071, 246 S.W. 2d 749, 755; Esstman v. United Railways Co. of St. Louis, Mo., 232 S.W. 725. The rules of credibility, generally, are the same in civil and criminal cases. The forms shown in §§ 10386, 10389 and 10384 of Raymond on Instructions, Vol. 4, cover, in substance, the questioned elements of Instruction No. 6. See, also, State v. Adair, 160 Mo. 391, 61 S.W. 187, 188, where the approved credibility instruction contained the words "* * * the witness' relation to or feeling for or against the defendant or the alleged injured party * * *." And see 53 Am.Jur., Trial, § 776, p. 577. Actually, the words "his or her relation to" do not necessarily imply a relationship by blood or marriage at all; they refer equally to any relationship in business or social life or in everyday affairs. The phrase complained of here included not only a "relation to or feeling towards" the defendant, but also a relation to or feeling towards "any sworn witness testifying in the case * * *." The instruction would be equally applicable to the testimony of Perry and of Helen Floyd; it might also apply to the testimony of all policemen if the jury believed that they had any "relation to or feeling towards" the defendant or any of the State's witnesses, whether adverse or favorable. We conclude that the instruction did not unfairly single out defendant's witnesses and that it was not erroneous.

Conceivably, counsel has assigned error of the court in permitting the jury to separate; we shall consider the point. Apparently, the members of the jury were twice permitted to go to their homes overnight under cautionary instructions. We assume that counsel relies on Section 546.230 RSMo 1949, V.A.M.S., pro-

viding that by consent the jury may be allowed to separate except in capital cases. Here the State did not ask the death penalty, nor did the instructions permit it. This, therefore, was not a "capital case." State v. Montgomery, 363 Mo. 459, 251 S.W.2d 654, 656. No objection to the separation of the jury is shown in the record. In the absence of objection it is presumed that defendant consented. State v. Montgomery, supra.

■ The remaining assignments of the motion for new trial are wholly insufficient under Rule 27.20. These are, in substance: that the court admitted irrelevant and incompetent evidence; that the instructions given were erroneous, misleading and improper; that the verdict was against the law and the evidence; that defendant was not afforded a fair and impartial trial; that defendant was deprived of his "constitutional rights"; and that the verdict was a nullity and the defendant was innocent. See generally, on the insufficiency of such assignments: State v. Swindell, Mo., 271 S.W.2d 533 (instructions); State v. Reese, 364 Mo. 1221, 274 S.W.2d 304 (instructions); State v. Schramm, Mo., 275 S.W.2d 343 (admission of evidence, verdict against weight of evidence, bias and prejudice); State v. Gaddy, Mo., 261 S.W.2d 65 (verdict against law and evidence); State v. Minor, Mo., 282 S.W.2d 545 (verdict against evidence); State v. Johnson, 362 Mo. 833, 245 S.W.2d 43 (rulings on evidence); State v. Clemmons, Mo. App., 283 S.W.2d 919 (admission of evidence, verdict against evidence and law). The assignment that the court erred in failing to give defendant's proffered instructions which were "proper and correct" is also insufficient. An assignment on the giving or refusing of instructions must "state the reason why the giving or refusal of the instruction was error." State v. Tebbe, Mo.App., 249 S.W.2d 172, 174. And see, also, State v. Grubbs, 358 Mo. 323, 214 S.W.2d 435, 437, specifically holding insufficient an assignment on the refusal of instructions.

The information, the verdict, and the judgment and sentence are sufficient; allocution was duly accorded. The judgment is affirmed, and it is so ordered.

STORCKMAN, P. J., and BROADDUS, Special Judge, concur.