**STATE of Missouri, Respondent,**

v.

**Verla Jane PINKSTON, Appellant.**

No. 47564.

Supreme Court of Missouri,

Division No. 2.

March 14, 1960.

Melvin E. Carnahan, Breuer, Northern & Crow, Rolla, for appellant.

John M. Dalton, Atty. Gen., Robert T. Donnelly, Sp. Asst. Atty. Gen., for respondent.

EAGER, Judge.

Defendant was charged by information with first degree murder, convicted by a jury of second degree murder, and sentenced to thirty-five years' imprisonment. The deceased was her husband, Frank Pinkston. Defendant and deceased operated a tavern on Highway 66 in Phelps County, known as "Club 66"; it contained a bar and dance floor, with living quarters in the rear. The shooting occurred in the living quarters. Since the only two points of error appearing in the brief involve remarks and conduct of the trial judge, no detailed recital of all the evidence will be necessary.

The killing occurred on November 5, 1957, at about 11:30 p. m. Defendant had been away from the tavern all evening, and at least much of the day; the deceased had been in and out, but he had gone to bed early in the evening. Defendant returned shortly prior to the shooting, drank all or part of a beer at the bar, and then proceeded back into the living quarters. She was followed by a friend and relative, Catherine Gollahon and, a little later, by deceased's brother Wallace Pinkston, who had been tending bar. It was shown that a .22 caliber automatic pistol had been lying on a shelf near the head of deceased, as he lay in bed. Wallace Pinkston testified that he saw

defendant shoot deceased twice with that pistol, she remarking at the time, in somewhat opprobrious language, that she would kill him. The testimony of Catherine will be referred to separately. There was much other evidence, direct and circumstantial, accusatory and defensive, but it all went to the jury issue, and we are not concerned with it here.

Catherine Gollahon, testifying for the State, was obviously a reluctant witness. She had told the special prosecutor that she would rather not discuss the case until she was "called to the witness stand." In substance, her testimony was: that she saw the defendant, Jane, switch on the light in the bedroom; that she (the witness) turned to set her purse down, and that when she looked back saw Jane jerk the covers off deceased and saw a gun in Jane's hand pointed toward the floor; that "someone whizzed by me," and she heard "Wally scream 'Jane'"; that she then screamed and ran out; that the only shot she heard was the one which Wally (the brother) fired into the soda pop cooler as he came out through the storeroom. This last shot was explained by "Wally" to have resulted from his nervousness after he took the gun from Jane. Catherine testified specifically that she did not see Jane fire two shots into her husband; also, that she did not tell Trooper Reynolds that "Wally came through the door as Jane fired twice at Pinky" (deceased), although she talked to Trooper Reynolds and told him what she knew.

The State then produced Trooper G. M. Reynolds of the Highway Patrol. He arrived at the scene of the shooting about an hour after it occurred; he took the pistol, and he and the Sheriff found four empty shells, but there was considerable confusion and they did not get much information of value at the time. He testified: that Jane fell off a stool while he was there and apparently lost consciousness; that she later regained consciousness and talked "pretty wildly," but said "I love him, I shot him. I don't want him to die"; that since

he and the Sheriff couldn't get "too much" out of Catherine that night, he and the Deputy Sheriff talked with her the next day at the home of Jane's mother; that Jane was there, so they took Catherine out to his car where she "told the whole story"; that she made the statement that "I screamed for Wally and Wally came through the door as Jane fired twice at Pinky. Pinky twisted and fell partly off the bed. Wally grabbed Jane and wrestled for the gun." (Counsel at this point was reading from a memo stated to be in counsel's own handwriting.) The witness further testified that he had "copied" these words down as "she said them," asking her to go slowly. He did not testify that she signed any statement. On cross-examination of Trooper Reynolds, defense counsel referred to the "statement that she made" and asked the witness if he had a copy, to which he replied that he did not "have it with me"; almost immediately, however, he said "It's not a statement, it's what she told me * * * It's incorporated in my report." He was then asked "Where is your report?" and he stated that it was "in the Highway Patrol." When asked if there was such a "statement on file" he replied in the affirmative, but he also said he believed that the words attributed to Catherine, as quoted above, were taken from the Patrol Report, but not by him. Counsel for defendant at this point requested that a subpoena be issued for "those records," and the witness stated that the original report had been sent to Jefferson City but that a copy had been retained at Troop Headquarters. A recess was declared, and the witness was then sent to Troop Headquarters to get the copy, after further specific discussion between the court and the special prosecutor to the effect that the "originals" were not there. When the witness returned, the cross-examination was resumed; counsel for defendant announced to the witness that he had not produced, "as requested, the statement" taken from Catherine; the witness again said that there was no signed statement, and "that's the only statement * * * made to me"; counsel stated: "I'm talking about the

statement that you said you wrote down * * *"; the witness answered that her statement was incorporated in his report, and counsel again insisted that "you haven't brought to me the writing you put down." At this stage the court intervened to say, in substance, that it was made clear in the previous testimony that there was only a typewritten copy of the report at the Troop Headquarters, that counsel so understood when he asked that a recess be declared and that the witness be sent there, and that counsel should "proceed" with this cross-examination. To a further question the witness said that he had no idea where the handwritten report or copy was. After the witness testified on re-direct examination that the portion of the report in question was "verbatim from * * * the handwritten copy," counsel for defendant moved for a mistrial because of the comments of the court and the reprimand of counsel, saying that it was not his understanding that the witness was "talking about any typewritten report." This motion was denied and the court had the reporter read the prior testimony to counsel, out of the presence of the jury.

■ The two points made here may be considered together. These are, in substance, that the court departed from the traditional and required attitude of impartiality by reprimanding, rebuking and arguing with counsel, of its own volition and not in response to any ruling or objection, and that it displayed an attitude of impatience and annoyance at counsel which indicated that it "was favorable to the prosecution" and thus prejudiced the defendant in the minds of the jury. The cases cited by defendant will be mentioned in our discussion, along with various others. On such a subject, it is seldom that a case precisely in point is found. The governing principles, however, are well established. The trial court must remain wholly impartial as between the parties and it should not indicate, directly or indirectly, a belief in the guilt or innocence of the accused; counsel must be treated fairly, and the court should not

so act as to humiliate or embarrass counsel. State v. Castino, Mo., 264 S.W.2d 372; State v. Montgomery, 363 Mo. 459, 251 S.W. 2d 654; State v. Hudson, 358 Mo. 424, 215 S.W.2d 441; State v. Moore, Mo., 303 S.W. 2d 60; State v. Jones, Mo., 197 S.W. 156; State v. Bunton, 312 Mo. 655, 280 S.W. 1040; State v. Teeter, 239 Mo. 475, 144 S.W. 445. But, on the other hand, it is the duty of the court to maintain order and decorum, to exercise a general control over the trial, to protect witnesses from abuse and intimidation, and to keep the inquiry within legitimate issues and within the applicable rules of law. To effectuate these purposes it may correct or reprimand counsel, when necessary. State v. Hudson, 358 Mo. 424, 215 S.W.2d 441; State v. Montgomery, 363 Mo. 459, 251 S.W.2d 654; State v. Brotherton, Mo., 266 S.W.2d 712; State v. Barnes, 325 Mo. 545, 29 S.W.2d 156; State v. Powell, Mo.App., 55 S.W.2d 334; State v. Stillman, Mo., 310 S.W.2d 886. Not every exhibition of "impatience" will constitute reversible error, for we are all human. State v. Turner, Mo., 320 S.W. 2d 579; State v. Barnholtz, Mo., 287 S.W. 2d 808; State v. Atkins, Mo., 292 S.W. 422; State v. Powell, Mo.App., 55 S.W.2d 334; State v. Hudson, 358 Mo. 424, 215 S.W.2d 441. Especially is this true where there has been no demonstrable prejudice of the defendant's interests through some indication that the court believes him guilty. State v. Atkins, supra; State v. Turner, Mo., 320 S.W.2d 579; State v. Barnholtz, Mo., 287 S.W.2d 808; State v. Powell, Mo. App., 55 S.W.2d 334; State v. Brotherton, Mo., 266 S.W.2d 712. Trial courts are and must necessarily be invested with a large discretion in such matters. State v. Thursby, Mo., 245 S.W.2d 859; State v. Turner, Mo., 320 S.W.2d 579; State v. Barnes, 325 Mo. 545, 29 S.W.2d 156. Defendant mildly criticizes the application of this rule of "discretion," saying that "remarks of trial judges are often glossed over * *" by the appellate courts. The vesting of a reasonable discretion in the trial courts is a matter lying at the very foundation of our judicial system. "In every court of gen-

eral jurisdiction there resides authority which is not strictly defined or limited by fixed rules of law, but which must be exercised in order justly to vindicate substantive rights, properly frame issues, and duly conduct trials." 27 C.J.S. Discretion p. 293. An appellate court cannot truly reconstruct the entire atmosphere and circumstances of a trial, with all its expressions and inflections, nor the total effect of stated occurrences and remarks upon the jury. We do not propose now to depart from these essential principles which we have so long followed. The loser in a combat often regards the rules as unfair.

■ Little would be gained here by a discussion of individual cases. We note that counsel only requested a mistrial, and not an explanation or withdrawal of the comments. We have determined that the remarks and conduct of the court did not constitute prejudicial error. For instances to the contrary, and by way of distinction, see, State v. Castino, Mo., 264 S.W.2d 372; State v. Jones, Mo., 197 S.W. 156; State v. Montgomery, 363 Mo. 459, 251 S.W.2d 654; State v. Bunton, 312 Mo. 655, 280 S.W. 1040. The record fairly showed that counsel knew, or should have known, that the Trooper had not purported to testify that he would procure his handwritten notes or report, but that he was merely going for a copy of the official Highway Patrol report. The "voluntary" remarks of the court were made, in essence, to confine the cross-examination to the legitimate issues, and they were not such as to humiliate or unduly embarrass counsel. And we fail to see how these remarks could possibly have been taken by the jury to indicate that the court favored the prosecution or believed the defendant guilty. The court was simply attempting to reflect what was in the prior record. The remarks did not fairly demonstrate any belief or disbelief by the court in the witness' credibility.

Finding no prejudicial error, the judgment is affirmed.

All concur.