State v. Valle.

---

## THE STATE v. VALLE, Appellant.

### Division Two, November 12, 1901.

1. **Principal in Second Degree:** COMMON INTENT. If a person be present while a felonious assault is being committed by another, and by words or acts aid or advise or encourage another to commit the assault, with the intent that the words or acts of encouragement shall encourage and abet the crime committed, he will be equally guilty with the person who actually commits the physical act.

2. ———: ———: INDICTMENT: CONVICTION. A person may be charged with doing an act himself and be held liable under such charge for being present, aiding and assisting another in doing it.

3. ———: ———: INSTRUCTION. The instructions in this case told the jury that "all persons are equally guilty who act together with a common intent in the commission of a crime, and a crime so committed by two or more persons jointly is the act of all and of each

one so acting," and, also, that,"If from the evidence, you find and be-
lieve that......the defendant, either alone or acting together with
another, with a common intent, feloniously made an assault," etc.
*Held*, that this instruction was proper whether the shot was fired by
defendant or by another who was being aided or encouraged by his
words or acts.

4. ———: ———: ———: CASE STATED. Defendant and a companion
were on a street car, and on leaving, used the vilest language to the
conductor for not having called their attention to the street where
they wished to get off. He stepped down on the lower step of the
platform and then swung back up and said, "I got a notion to smash
you," and grabbed at and struck at the conductor, who, finding him-
self penned in between the two, in order to get away from them struck
the defendant, and immediately threw open the car door and went
inside, slamming it behind him. One of the men threw open the
door, and shot him, and immediately both disappeared, some wit-
nesses testifying that the shot was fired by defendant, others that he
was knocked to the ground when the conductor struck him, and did
not again mount the car, and that the other man did the shooting.
*Held*, that under the circumstances, the instruction permitting de-
fendant's conviction, whether he did the shooting himself, or aided
and abetted it, was properly given.

Appeal from St. Louis City Circuit Court.—*Hon. Selden P. Spencer*, Judge.

AFFIRMED.

*C. Orrick Bishop* for appellant.

While the instruction may be good in the abstract, we
contend that, in this cause, it was unwarranted by the evidence,
calculated to mislead, and prejudicial, especially, as without
amplification, it certainly suggested to the jury that it made
no difference whether the shooting was done by appellant or
Brown, they being companions on the car. A mere presence,
or presence combined with a refusal to interfere or a mere
knowledge that a crime is about to be committed, or a mental

approbation of what is done, while the will contributes nothing to the doing, will not create guilt. In the matter of evidence, such facts have a greater or less weight according to the circumstances; but in law there must be something a little further, as some word or act. 1 Bishop, New Crim. Law, sec. 633. In these, as in all other cases, intent and act must be connected. So that, if one has the criminal intent and another does the criminal act, the intent not contributing to the act, not strengthening it and not in any way influencing it, there is in the former person no crime. Ibid. sec. 643; 1 Wharton Crim. Law (10 Ed.), sec. 211a. To constitute a principal in the second degree, there must be not only a presence and an aiding and abetting, but a participation in the felonious design, or at least the offense must be within the compass of the original intention. 1 Chitty Crim. Law, p. 258. This is the doctrine of the common law. The charge should be in effect that if J was present aiding and abetting S, knowing or believing that S intended to kill P, or with a premeditated design to kill, aided and abetted S in his act, he was equally guilty with S. Savage & James v. State, 18 Florida 962. It is plainly not the law that one can be guilty of murder, without any overt act, who by neither word nor gesture has done anything to contribute to the commission of the homicide or to assist, encourage, or evince approval of it, at or before the fact, and of whom it only appears that he was present and knew of the crime and mentally approved it. The silent thought, however wicked in view of the Searcher of hearts, is not a crime against our laws, but is left by them to another than a human tribunal. Clem v. State, 33 Ind. 432; State v. Farr, 33 Iowa 562; State v. Hickam, 95 Mo. 322.

*Edward C. Crow,* Attorney-General, for the State; *Perry S. Rader,* special counsel.

There was sufficient evidence on which to base an instruction charging defendant as a principal in the second degree. If he was present and aided, abetted, counseled, encouraged, incited, or stirred up Brown to fire the gun, he could, under our statute, be tried and convicted as a principal. R. S. 1899, sec. 2364; State v. Anderson, 89 Mo. 312. In Hicks v. United States, 150 U. S. 443, it is held that if the defendant was present and by words or actions aided or abetted or advised or encouraged another to commit murder, with the intent that the words or acts of encouragement should encourage and abet the crime committed, he was guilty. Sage v. State, 127 Ind. 29; Brennen v. People, 15 Ill. 511; Spies v. People, 122 Ill. 253; White v. People, 139 Ill. 149; Foster's Discourses on Crown Law, p. 570, sec. 3; 1 Bishop, Crim. Law, 648; 1 Whart. Crim. Law, sec. 211a; Griffith v. State, 90 Ala. 588. In State v. Nelson, 98 Mo. 417, this court said, in regard to three negroes who were indicted for murder: "The testimony on the part of the State was sufficient to authorize the conviction of all the defendants; Royston, as well as the other two, because the testimony clearly shows that he was present assisting and abetting his co-defendants, although he did not personally participate in the assault made." See also: State v. Orrick, 106 Mo. 120; State v. Gooch, 105 Mo. 394; State v. McKinzie, 102 Mo. 626. Under these cases, it certainly is not the fact that there was no evidence on which to base an instruction that defendant might be convicted as a principal in the second degree for aiding and abetting the assault. Valle had threatened to smash the conductor, and had undertaken to carry that threat into execution by striking at him, and when the conductor struck him for the purpose of getting away, either Valle or Brown shot him. If Valle's conduct did not incite and encourage the shot, what did?

BURGESS, J.—Under an indictment charging defend-
ant and one Lem Brown jointly with assaulting and shooting
one Edward C. Bell with a pistol, with malice aforethought,
defendant was convicted, and his punishment fixed at five
years' imprisonment in the penitentiary.    After unavailing
motion for a new trial defendant appeals.

On the evening of December 31, 1899, Edward C. Bell
was the conductor of a Laclede avenue street car running
east on Market street from Jefferson avenue to Thirteenth
street in the city of St. Louis, and about nine o'clock of that
evening defendant and another negro boarded the car as it was
going east (west of the Union Station).    The conductor col-
lected of them their fare, and when he did so they spoke of
being let off at Fourteenth street, but the car did not stop
there, and they did not get off, but when the car approached
Thirteenth street further on, they arose from their seats and
started to get off.    Defendant was in advance, and abused the
conductor, and in so doing used as vile epithets as ever escaped
the lips of man, and when he stepped down on the lower step
of the car and was standing there, he remarked to the con-
ductor, "I got a notion to smash you," and stepped up with
his foot on another step, and made a grab at him.    The con-
ductor then testified in this connection: "And the larger one,
the black one, was standing right near me, and this one (de-
fendant) made a strike at me, and I dodged back from him
and dodged right against the other one.    Then he (defendant)
came up on top of the step for me and struck at me.    Then,
to make myself room and get away, I struck at him and jerked
the door open at the same time and went on the inside of the
car to get help and get away from the two of them.    I just
struck at his face, just to make myself room to keep him away
from me as long as possible, until I could get away, because
I was between the two of them.    That is the reason I struck,

State v. Valle.

to simply make myself room and to get away.   Then I went
in the car and went to the stove to get a poker.   As I stepped
down to the stove to see if I could get something to defend
myself with, some one halloed, 'Look out!' (I never knew who
it was), and I raised up, and just as I got straight in the car
I saw this one, defendant, step in about one step inside the
door—about equal with the front seat, I should judge—and
had a gun kind of up in front of him; then he took it down
like, then he pointed it right at me deliberately and fired and
I fell.   By the time I had got on my feet he had disappeared.
He hit me just an inch and a half from the top button of my
vest to the left —the bullet lodged about two inches from
where my arm leaves my body."   The witness testified that
he saw nothing of the other man at the time, and after a
futile attempt to find the men, was  taken to the hospital,
where some hours afterwards the defendant was brought to his
bedside by some officers and he identified him as the man who
shot him.

On cross-examination  he  said:    "Brown,  co-indictee,
never spoke a word, that I remember of.   I know that the
defendant was knocked off the car, knocked out of my reach.
Didn't see his hat knocked off; know he came back bareheaded.
The car was standing still when I knocked him off.   I struck
him to get away and went in the car.   I saw him coming to-
wards the car again with his hat off.   He was about six feet
from the car when I saw him coming, bareheaded.   At the
time, the other man was standing between me and the rail at
the platform; that was the last place I saw him, and to my
knowledge have never seen him since."

James F. Milligan, after testifying that he was a passen-
ger on the car, saw no difficulty, but said:   "All I seen, along
between Thirteenth and Fourteenth somewhere, the car stopped
and he pulled a revolver out and shot.   I never seen any fuss

at all.    They were both in the car.    This man, Valle, was standing right in front of the door, and Bell (the conductor) was at my back somewhere.    The seat I was sitting in was facing the rear end of the car.    After he fired the shot he got off the car.    The defendant fired the shot.    Didn't see anything occur on the platform.    There wasn't any disturbance in that car or any loud talk that I heard, and I certainly would have heard it if there was.    The first thing that attracted my attention was when the car stopped, the door opened, and he (defendant) stepped in.    The car was at a standstill.    There was only one man there at the time of the shooting.    Defendant had on a dark suit of clothes and an overcoat, and I am positive he had on a black stiff hat; the man who stood there in the door and fired had on a black stiff hat.    Next saw the defendant at the police station an hour or two after the shooting; he had a couple of pieces of court-plaster over his nose."

Anna McDonald was a passenger on the car, sitting near the front.    "When we got to about Fourteenth street, someone said something about stopping at Fourteenth street, and the conductor answered in a mild way that he didn't know they wanted to get off there, and then this party (whoever was doing the talking) said:    'That's the way with all you conductors,' using a curse word.    The car did not stop at Fourteenth street; to my knowledge it didn't stop there.    Didn't see the men go out of the car, but everything was quiet after that.    It couldn't be over a minute when the shot was fired; think the car was moving at the time.    The conductor was stooping down when some one called out, 'Look out!' and just then the shot was fired.    Saw no one in the aisle but the conductor. Don't know who fired the shot; can't say whether it was fired inside the car or from the outside."

S. A. Bruton was also a passenger; sat with his back to

the door, three or four seats from the door; was facing (the prior witness) Milligan. Heard no altercation or loud talk of any kind before the shot was fired. This witness said that there were only three women, one who sat beside him, the witness Anna McDonald and a colored woman and that there was not a child on the car.

C. A. Lewis testified that on the night and at the time of the shooting, about ten minutes to 9, he was in the pawnshop of one Gallant at Targee and Market (about two blocks from the car) when appellant came in and bought a cap from Gallant and told Gallant "not to let anybody know that he had been there." He said, "In case anybody comes here, tell 'em you haven't seen me." "I heard the shot and it was eight or ten minutes after the shot that defendant was in there. He made no explanation at all. He had a cut about here (indicating); it was very small. The blood was coming out of it. He said he was in a hurry, to give him a cap quick. He had two other colored men with him. After he got the cap he walked out again." On cross-examination he stated that Mr. Gallant was then present in the circuit attorney's office. Gallant knew the men who were with the defendant, "because they have been coming in his house all the time. The defendant had nothing on his head at the time; made no remark about his hat and gave no reason why he wanted a cap."

Officer Keeley arrested appellant at 1418 Chestnut street, on the second floor (about three blocks from the scene of the shooting), after 12 o'clock, midnight. "Saw a hat at Murrell's (between Thirteenth and Fourteenth, on Market) with initials, 'T. V.' on outside. Valle was sleeping on the floor. Noticed defendant's face—across the nose it seemed somebody had struck him, because it was swelled and bleeding, about the bridge of the nose. He made a statement that he had had some trouble on a street car, and the conductor knocked him off

the car; that he didn't want to get into any trouble, and ran away. Said the hat was his. Took him to the hospital. Bell was in bed, and when we brought him up to Bell, Bell at first didn't recognize him. He says, 'No, I don't think he is the man.' So he says, 'Take him back a little, I can't see very well.' So we took him back; and after we walked him back three or four feet, why he says, 'Yes, he is the man.' In the meantime, Officer Walsh asked Valle, 'Ain't this the conductor that you had trouble with on the car?' and Valle made some remark (I didn't understand him), and Walsh says, 'Speak out.' He says, 'Yes, I had trouble on the car with a conductor, but I don't know whether this is the one, or not.' So, after that, Mr. Bell said, 'Yes, this is the man that shot me.' Defendant made no reply, at all, to that." Cross-examined: "Never have seen the hat since. When arrested, he had a cut on the nose and blue there on the sides, eyes somewhat discolored and a little swollen; looked like a pretty good blow. He said there was a fellow named Lem Brown with him. Knew Brown; a very dark fellow, with a mustache. Tried to find him; never been able to see anything of him or get on track of him; heard he was in Chicago; that's all. Defendant said he hadn't seen anything of Brown since he was knocked off the car. At the hospital Valle took off his hat and stood right there where Bell could have a good look at him, made no objection; in fact, absolutely helped the officer to confront him with the wounded man; walked right up to the bedside and took off his hat so that the conductor could have a good, square look at him. At that time the conductor said he didn't think he was the man. It was after Valle had made the admission that he was on the car and had trouble with the conductor, that the conductor said, 'Yes, he is the man that shot me.' Saw defendant in the holdover next day, and his face seemed to be very much swollen and his nose very sore."

On the part of the defendant the testimony tended to show the following:

George Bell, a barber at 1407 Market street, testified that he was coming up Market street, between Thirteenth and Centre; a Laclede avenue car was passing; hearing some unusual loud talk on the car, noticed the car, and during the time there were two or three men standing on the rear platform; there was a blow struck and a man fell from the car; during the time a shot was fired and it seemed as if it was from the inside of the car; it was while this man (defendant) was on the ground that the shot was fired; he was in a kind of a half raised position, getting up, wiping his face with his right hand —a handkerchief in his hands, and during that time a shot was fired; and there was a tall dark fellow sprang from the car, and goes down Centre street in a run; don't think the man on the ground had any hat on.

Dr. Waldo Briggs testified as to his treatment of defendant for a wound, a lacerated injury over the root of the nose, seeming to have been by a blunt instrument; shouldn't think it was made simply by the hand; the injury extended into the bone; would swear positively that it was not done with the fist, but by some blunt instrument, though it may have been by a ring on the hand.   Though not certain as to the date of the treatment, it was shown to have been prior to the eighth day of January (within a week of the shooting) by his subpoena to appear as a witness on the preliminary examination in the court of criminal correction on that date.

Eugene Isabel testified that he was in front of Bridgewater's saloon, 1309 Market, when the trouble happened; saw the shooting, "when he hit that man and knocked him off the car, and as he did so, he run back into the car by the stove and stooped for some thing; as he rose up he looked as if he was going to come back out again.   As he rose to straighten up

good, why the other man that was on the back of the car shot him, a tall dark man, and as he did so, he jumped off the car and ran through Centre street; the man that was knocked off the car never got on the car again. Knew Valle by sight, but did not recognize him that night, but took him to be a white man. Don't know who the tall dark man was. The man knocked off the car was knocked flat on his back; he was rolling over, and when I saw him he was on his feet with a handkerchief up to his head; when the shot was fired, he was just getting to his feet. Know he didn't get on the car again, because I saw the man that shot, a tall dark man."

Lizzie Jackson testified that she was a passenger on the car, saw the two men get on the car and sit down. Saw the other witnesses there; there were no children on the car; after we passed Thirteenth street noticed them getting up to go out; didn't hear anything they said at all; heard mumbling on the back of the car, but didn't hear what was said because the door was closed; the car was slacking up, it was almost at the switch at the time this occurred; saw the conductor strike at some one and then he walked in, then walked to the stove and was leaning over the stove and all at once the gentleman that was with him (defendant) steps up and pulls the door open with his left hand and shoots. The man that shot was a dark brown man, a little taller than defendant. Saw something in conductor's hand at the time, don't know what it was; there was something picked up by a gentleman in the car and given to the motorman.

The appellant testified in his own behalf that he and Lem Brown got on the car at Jefferson avenue and Market, and when the conductor collected their fare asked him to let them off at Fourteenth street, he said "all right" and went back; nothing further was said at that time, the car did not stop at Fourteenth street and after it passed he and Brown got up to get

off; opened the door, and appellant said to conductor, "Why didn't you stop the car at Fourteenth street? I thought I asked you to stop the car on Fourteenth street; if I had been a white man, G———n you, you would have stopped the car on Fourteenth street."Appellant was then on the bottom step and about to alight, and said: "I've a good notion to report you." Then the conductor struck appellant and knocked him off the car. "He knocked me near dead on my feet, and just as I was raising up, I heard a shot, I was just getting up; I had a handkerchief wiping my face; don't know who fired the shot; can't swear whether Lem fired the shot or the conductor; I had nothing to fire with; I never had no pistol; after the shot was fired, I went right across the street, up Market street to Gallant's, got a cap and went right straight home; I was just about getting up when the shot was fired; after I was knocked off the car I did not get on the car again at any time; no one went to Gallant's with me; he asked me what was the matter and I told him I got knocked on the head by a conductor; Mr. Gallant is down here now and will testify, he'll tell you what I said; don't know what became of my hat, saw it that night at the station, never since; it had my initials in it, 'T. V.;' after I was knocked off the car, I never saw Lem Brown nor heard of him."

Over the objection and exception of defendant the court instructed the jury as follows:

"1.   All persons are equally guilty who act together with a common intent in the commission of a crime, and a crime so committed by two or more persons jointly is the act of all and of each one so acting.

"2.   If from the evidence, and under these instructions, you find and believe that at the city of St. Louis and State of Missouri, on December 31, 1899, the defendant, Thomas Valle, either alone or acting together with another one, with

a common intent, feloniously made an assault upon and shot
Edward C. Bell with a pistol loaded with gunpowder and
leaden ball, and that he did so willfully, on purpose and of his
malice aforethought, and with the intent to kill the said Ed-
ward C. Bell, you will find the defendant guilty of an assault
with intent to kill, and assess his punishment," etc.; "and
unless you find the facts so to be, you will acquit the defendant
of such assault with intent to kill."

While it seems to be conceded by defendant that the in-
structions may be good in the abstract, it is claimed that they
were unwarranted by the evidence, calculated to mislead and,
prejudicial, and without amplification, suggesting to the jury
that it made no difference whether the shooting was done by
defendant or his co-indictee, they being companions on the car.

While the authorities hold that the mere presence of a per-
son while a felonious assault is being committed by another
upon a third person, or a mental approval of what is being
done, will not, in the absence of some word or act of approval
or encouragement, make such party guilty of a felonious as-
sault, yet if he be present and by words or actions aid or advise
or encourage another to commit a felonious assault, with the
intent that the words or acts of encouragement should encour-
age and abet the crime committed, he will be equally guilty
with the person who actually commits the physical act; "and
a party may be charged with doing an act himself and be held
liable under such charge, for being present, aiding and assist-
ing another in doing it." [Willi v. Lucas, 110 Mo. l. c. 222;
Canifax v. Chapman, 7 Mo. 175; Page v. Freeman, 19 Mo.
421; Allred v. Bray, 41 Mo. 484; Murphy v. Wilson, 44 Mo.
313; Cooper v. Johnson, 81 Mo. 483; State v. Orrick, 106
Mo. 111.] And it is not necessary to a conviction that it be
proven by direct evidence, that a person advised an act, or
aided by any overt act in its commission, but such fact may

be shown by facts and circumstances. [State v. Gooch, 105 Mo. 392.]

With these well-settled principles in view, which are announced in the instructions, were they authorized by the evidence and facts disclosed by the record? We think they were. The defendant and his companion Brown boarded the car together, and when they alighted therefrom, defendant made use of the most indecent and insulting language to the conductor that he could command, and, while standing on the bottom step of the car said to him, "I got a notion to smash you," and stepped up on the step and made a grab at him, and struck at him, during which time Brown was standing near him. Then to make himself room and get away the conductor struck at him, jerked the door open at the same time and went on the inside of the car to get help and get *away from the two men.* He testified that the defendant then followed him into the car, and shot him, while defendant testified that the conductor knocked him off the steps of the car, and that he had nothing to do with the difficulty, had no pistol, and did not do the shooting.

There was evidence tending to show that Brown did the shooting, but defendant provoked the difficulty and the evidence did not show, we think, that he had abandoned it at the time of the shooting; upon the contrary, even if he did not do it himself, he was present and taking part in the difficulty, and a party thereto. In fact, the weight of the evidence was that defendant did the shooting himself.

We are, therefore, of the opinion that the criticism on the instructions is without merit, and that the judgment should be affirmed. It is so ordered. All concur.