**STATE of Missouri, Respondent,**

v.

**Terry Lamonte BALLE, Appellant.**

**No. 53823.**

Supreme Court of Missouri,
Division No. 2.

June 9, 1969.

John C. Danforth, Atty. Gen., Gene E. Voigts, Asst. Atty. Gen., Jefferson City, for respondent.

Greensfelder, Hemker, Wiese, Gale & Chappelow, St. Louis, for appellant.

PRITCHARD, Commissioner.

Defendant was charged with commission of the crime of robbery of the Gem Super Market in St. Louis, Missouri, with a dangerous and deadly weapon, a pistol. A jury found him guilty and assessed his punishment at imprisonment for five years.

On May 2, 1966, about 5:45 p. m., just before closing time of the Gem Super Market, its owner's son, Stanley Gerstein, was working therein in the meat department. A man came up to the counter, and Gerstein asked if he could help him. The man put a gun in Gerstein's face and said, "Lay on the floor." There were then five or six persons in the store including two employees, Frances Perkins, the cashier, and Jimmy Cheers, a delivery boy. Gerstein obeyed the man, who said further, "Don't move or I will kill you," and then started to go through Gerstein's pockets. Another man came up, went through Gerstein's pockets, and took his money, about $13.00. After about five minutes, the man told him to get up. Gerstein and some customers were then put into the cooler where they remained a few minutes. Gerstein made an in-court identification of defendant as the man who pointed a gun at him. Before he was ordered to lie down, Gerstein stood looking at defendant for a couple of minutes. He remained on the floor for about five minutes during which time he was looking sideways and partially up and could see defendant bending over. It was twenty or twenty-five minutes from the time defendant put the gun on Gerstein until he called the police, fifteen minutes of which he was looking directly into defendant's face.

On September 12, 1967, Gerstein was contacted by Officer Miller of the Police Department. Miller asked him to look at some pictures, about fifteen, to identify the man who held him up. He recognized defendant among these pictures. The next afternoon Gerstein went to the Central District and viewed three Negro men in a lineup. The first man was a little taller and thicker than defendant, who was in the middle. The next man was about the same height, but a little heavier. Gerstein was positive the man he identified was the man who held him up, "Because he is the only man that ever held a gun on me and I would never forget that."

On cross-examination Gerstein testified further that he was standing behind the meat counter, about its center, and the man was opposite him in front of the counter which was two or three feet wide. The man was wearing a hat, there being no hat in the picture Gerstein identified as defendant. Gerstein, being five feet eight inches tall, was looking at the man at eye level. When the man came around the counter he did not have on a hat, and his hair was combed straight back, with a lot of grease on it, in the same manner as in the photograph which Gerstein identified as being defendant. The pictures which Officer Miller asked Gerstein to look at to see if he could identify the person who held him up were of many kinds of Negroes, many with scars on their faces, and defendant's picture was about halfway through. When Gerstein saw that picture he stopped, knowing it was of the man. In the lineup, the first man, about five feet ten inches in height, was darker than defendant. The other man was about the same height, but was a little heavier. The other lineup witness, Miss Perkins, who came there at the same time, was not with Gerstein when he viewed the lineup. She and Gerstein were taken to the lineup separately, there being two officers present when they went to the lineup. The other two persons in the lineup did not look like defendant at all, and anybody who would have seen a picture would have been able to pick defendant out among those three men "real fast." The pictures he saw were all about the same time, and that of defendant showed a front and a side view.

Frances Perkins was on duty as cashier in the store on May 2, 1966. She was leaning over the counter making out a money order when an individual came in and said, "Stick up. Ring the cash regis-

ter." He had a gun, silver in color. Miss Perkins rang the cash register and stepped aside, and another young man came around and took out the money. She saw defendant in the store on the way to the back, with his hand in his back pocket. He said nothing to her. Miss Perkins identified defendant in court as being the man she saw in the store on May 2, 1966. On September 12, 1967, she was contacted by a detective, who asked her name "and asked could I come down, they had a fellow they wanted me to identify." One of the other persons she saw in the lineup was rather small and the other was rather stockily built. She was able to identify defendant in the lineup as the man who participated in the robbery.

On cross-examination Miss Perkins testified that the detective came to her and wanted her to go to the holdover and identify the man. He told her that they had arrested the man in the holdup. Defendant, in the lineup, had a medium complexion. The stocky man was brown skinned, and she did not notice his hair or that of the small man. She was not shown pictures before she went to the lineup and was not told that the man was Mr. Balle, but heard that the man had already been identified by Gerstein. She saw defendant as he came in the store, and he then had slick hair, but she didn't see a hat on him. She saw defendant's picture in a newspaper after the lineup, and the detective told her defendant's name before she went to the lineup. (On redirect examination, she testified that this was not before she went to the lineup room. She did not know anyone's name while viewing the lineup.) It took defendant five or ten seconds to walk past Miss Perkins (at one place she testified it took five minutes) and she was facing the door as he came in. She testified that she could identify somebody who had walked past her, "Yes, I can. I can identify anyone. I don't forget a face."

Detective Richard A. Miller was assigned to the robbery case in September, 1967. He took a photograph of defendant, along with about fifteen other photographs, to Gerstein on September 12, 1967, placing defendant's photograph in the center. Gerstein picked out defendant as the man who held him up, saying, "Officer, I will never forget him. I am very positive; that is him." There were two other persons in the lineup, one (Clyde Strong) slightly taller than defendant, and one (Claiborn Fudge) about his size, but more flabby, defendant being more stocky or solid. Strong was a little darker than defendant, and Fudge was about his same color in complexion. Miller went through the Negro male subjects in the holdover to select someone the same description as defendant. The ones selected were at the time as close in appearance to defendant as he could get. Miller had known, by rumor, that defendant was involved in the robbery, and went with the photographs to Gerstein with that knowledge.

Prior to the lineup, Officer Casey, in Miller's presence, asked defendant if he wanted an attorney. Defendant after the time of his arrest was advised of his right to an attorney of his choosing, and that if he could not afford one that one would be furnished, and was also so advised prior to the lineup, and once in the presence of the victim.

Officer Thomas Casey arrested defendant about 11:00 a. m. on September 13, 1967. Gerstein and Miss Perkins were then called to police headquarters to view defendant in a lineup. Prior to the lineup defendant was first advised by Officer Miller that he did not need to make a statement, if he wished to do so it could be made in the presence of his attorney; if he could not afford an attorney one would be provided him; and anything he would say, in regard to questions asked, would be used against him. Defendant declined to make a statement. Later, again before the lineup took place, Casey informed defendant that they were going to conduct a showup, and asked if he was aware of what it was, to which the answer was affirmative. Casey further told (asked) him

if he desired to have an attorney present, and defendant indicated he had no money. Defendant told Miller he did not need an attorney, "There is nothing you can charge me with. I haven't done a thing. I do not need an attorney."

At the close of the state's case, defendant made a request for the issuance of subpoenas duces tecum to the Chief of the Police Department for the production of the records of Claiborn Fudge and Clyde Strong. The request was denied, and defendant made an offer of proof, which was denied, that these records would materially impeach the testimony of various witnesses who testified as to the size, color and weight of Clyde Strong and Claiborn Fudge (who were in the lineup with defendant). Defendant also sought at this time the issuance of a subpoena duces tecum to the Circuit Attorney for the production of the transcript of statements of state witnesses Gerstein and Miss Perkins, which was denied. Defendant's offers of proof were likewise denied.

■ Under the facts of this case, clearly shown by the record, there is no merit in defendant's attacks upon the lineup procedure and the in-court identification of defendant by witnesses Gerstein and Miss Perkins. Both of these witnesses had ample opportunity to observe defendant in the store at the time of the robbery, and so testified. Thus, their in-court identification of defendant had an independent source aside from the lineup. See State v. Mentor, Mo., 433 S.W.2d 816, 819, where the witness, similarly as to the two witnesses here, had considerable opportunity to observe defendant at the scene, held to be an independent basis for the in-court identification which did not result from her observation of the defendant in the lineup. Furthermore, witness Gerstein picked out defendant's photographs from fifteen others without suggestion from the police officers, and under circumstances that were not manifestly unfair under Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247, 1253, in that

there was no picture of a single individual who generally resembled defendant whom Gerstein saw; there was no recurrence of defendant's photograph nor was the same in any way emphasized; and there was no indication from the police officer that there was other evidence that one of the persons pictured committed the crime. In short, there was no photographic identification procedure which "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons, supra, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1253[2, 3].

■ Under the totality of the circumstances here there was no denial of due process of law to defendant in receiving the evidence of his in-court identification within the pronouncements of the cases of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. Nor was there any infringement, under those cases, of defendant's constitutional right to have counsel present at the lineup. He was clearly advised of such right and unequivocally waived the same: "There is nothing you can charge me with. I haven't done a thing. I do not need an attorney."

■ While Miss Perkins was equivocal in her testimony that she did not know defendant's name prior to the lineup, yet her testimony was positive and unequivocal that she observed defendant in the store at the time of the robbery, and that she did not forget a face. Under the evidence presented Fudge and Strong who were in the lineup with defendant did not closely resemble him, and both Gerstein and Miss Perkins there readily picked him out. Thus, even if there were merit in defendant's request that the police records should have been produced to show a vast dissimilarity of these two persons to defendant as they stood in the lineup, yet the strong testimony of Gerstein and Miss Perkins shows that the lineup was not the sole

source of their identification. It is therefore apparent that the trial court did not err in refusing the request for the production of the records of Fudge and Strong.

■ As to the request for production of the transcript of statements of witnesses Gerstein and Miss Perkins, defendant made no examination of the witnesses to ascertain if they had in fact made such statements, nor was it asked if their testimony in court was consistent with any such statements. No showing was made, by offer of proof or otherwise, that any such statements were of such nature that without them defendant's trial would be manifestly unfair. State v. Aubuchon, Mo., 381 S.W.2d 807, 814. Under these circumstances there was no abuse of discretion by the trial court in denying appellant's request.

■ Officer Miller testified that he knew (before arrest) that defendant was his prime suspect; that somebody advised him that defendant had been involved in the robbery, which knowledge he had before he took the pictures to Gerstein for identification, which in turn he knew had to be done. Somebody was supposed to have tipped Miller off that if he got Gerstein to identify, defendant "will be the subject." Defendant made no objection to this testimony. On argument to the jury counsel for the state stated, "Again, the State's evidence is based on four points: First, the reliable information the police obtained." Defendant objected, made a motion that the jury be instructed to disregard the argument, and moved for a mistrial, all of which were overruled. The state continued, "The first fact is, again, the reliable information police received. Secondly, positive identification by Stanley Gerstein. * * *." Defendant here attacks the trial court's ruling on grounds that the argument referred to supposed facts which had not been introduced into evidence, were not a part of the record,

could not be made a part of the record because such information would have been hearsay, and that the remarks of the Circuit Attorney inferred to the jury that he knew facts which were not part of the record, but which were an essential element of the state's case. Any incompetency of the testimony of Miller was waived by defendant's failure to object. It was thus in the record and was available for argument. State v. Brock, Mo., 273 S.W. 2d 166, 168 [6, 7]. No reversible error appears.

■ Defendant also contends that error was committed when the trial court refused to grant a mistrial as to this portion of the state's argument: "You have no background of the defendant, it is not proper evidence, and when asked to assess punishment it is * * *." Defendant's objection to the argument was sustained, and the jury was instructed to disregard the statement. The trial court is vested with discretion as to a determination of prejudice as should require a discharge of the jury. That discretion will not here be interfered with unless the record discloses an abuse thereof. State v. Tallie, Mo., 380 S.W.2d 425, State v. Deutschmann, Mo., 392 S.W.2d 279. Defendant here received the minimum of five years imprisonment at the hands of the jury for the armed robbery. The argument, though improper as ruled by the trial court, clearly related to the punishment the jury might assess. Thus, no prejudice to defendant appears and the point is without merit.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.