STATE of Missouri, Respondent,

v.

Nathaniel WARTERS, Appellant.

No. 54242.

Supreme Court of Missouri, Division No. 2.

Sept. 14, 1970.

John C. Danforth, Atty. Gen., Gene E. Voigts, First Asst. Atty. Gen., Jefferson City, for respondent.

Emanuel Williams, (Deceased) Joseph S. McDuffie, St. Louis, for appellant.

BARRETT, Commissioner.

Nathaniel Warters, age 29 in 1967, has been found guilty of rape and sentenced to fifty years' imprisonment. The indictment under which he was convicted charged that on July 14, 1966, Warters, Bradford Hull and Michael Taggert forcibly ravished Judith, age 20. Upon a severance and change of venue Taggert and Hull were found guilty and sentenced to fifty years' imprisonment and their convictions were affirmed in State v. Taggert, Mo., 443 S.W.2d 168. Not only is this a companion case many of the questions raised in that case are again raised here. In view of several points raised it is necessary to state at the outset that Warters, Hull and Taggert are all adult Negro males and that Judith is a white girl and prior to being ravished was a virgin.

In brief, the circumstances were that on July 13, 1966, Judith, her younger sister, Mrs. Richardson, and her friend Lisa went to the Municipal Opera. After the opera, about midnight, they all returned to Mrs. Richardson's in Crestwood where they remained until about one o'clock. Judith took her mother and sister home and after leaving the garage door open drove her friend Lisa to her home in Affton. She returned immediately and drove into the open garage adjoining the breezeway. She got out of the car, holding her purse and keys, and at the overhead door turned a light on and as she lowered the door "saw this brown body humped over in between my two taillights of my car." (Warters, Hull and Taggert were stripped to the waist and wore only pants and shoes). She at-tempted to reopen the door, "and yelled, and I screamed and screamed" but the man "jumped up right away and put his hand over my mouth and tried to hit me," finally dragging her to a side door where "the second man jumped me, and then he approached me from the back, and he, too, put his hand over me, and they were both fighting with me, and I was struggling to get away." In front of the house "the third one jumped me" and "they tried to pick me up and I kept fighting them * * * and they dropped me several times and twice I hit my head on the concrete when they dropped me, and I kept fighting." At Ferndale Park she tried to get away again "and they kept punching me and holding my mouth" and when "they took out a knife and put it at my throat right here" Judith became unconscious for a short time. She regained consciousness when she "went in the back seat of the car." She said that she was thrown to the floor of the car and "right away the Number One guy that jumped me at the door got on top of me and pulled my dress up and ripped off my girdle and my panties and he tried to rape me." The "Number Two" man took her fist and "undid it" and her St. Christopher medal fell to the floor "and he took off my diamond ring and my watch, and he had trouble taking my watch off by the clasp, so he just ripped it off then." The "Number Two" man was the defendant Warters. She continued her struggle in the automobile in the back seat "and Number One man and Number Two man kept pulling my head down and kept socking me in the head." The car was driven up Harper Avenue alongside the Algonquin Country Club into a weeded area, two of the men pulled her from the car, put a rag over her face and laid her down and "Number One man held my shoulders down and my hands and while Number Two man proceeded to rip my bra half way off, and my dress at the time was completely off, and my slip he ripped down, and Number Two man got on top of me and raped me." And then in turn as one or more held her down the others raped Judith. Once, as she said, "Let me go" one

of them said, "No, just shut up. We ought to just kill you." And finally she said, "they just didn't know what to do with me. They didn't know where to put me, or anything." And "then, Number One man put a rag over my face" and walked her over to a bush and commanded her to lie on her stomach. As she did so she begged "Please give me a dime. I want to call my mother" but he had no dime "and I saw him run off and join the others." She made her way to the Boccias, the police and an ambulance were called and at the hospital a doctor confirmed the fact of her bruises, scratches, teeth marks and the fact that she had been raped. On February 3, 1967, Judith identified the appellant as the Number Two man who raped her and took her watch. The defendant testified that he had never seen Judith, he said that he did not rape her or take her watch, denied that he had signed the "waiver of rights," denied that he had made any statements to either the police or to Mr. McNary, the prosecuting attorney. In addition he testified that Chief Zinn had told him that if he would turn "State's evidence, he would try to get me two years," but "I told him I didn't have anything to take advantage of the offer he made." He said that the police asked him about and he denied any knowledge of five other "attacks" in that area. He offered no other testimony even though his wife and sister talked to him in the Webster Groves police station where he voluntarily appeared when his mother informed him that the police were looking for him.

■ The noted testimony and these circumstances, needless to say, support the charge and the jury's verdict and punishment. RSMo 1959, § 559.260, V.A.M.S.; State v. Taylor, 118 Mo. 153, 22 S.W. 806; State v. Wilkins, Mo., 100 S.W.2d 889, 893; State v. Arrington, Mo., 375 S.W.2d 186; State v. Martin, Mo., 428 S.W.2d 489. In this background the appellant has briefed and argued fifteen points, some, as points X, XIII and XIV, without citation of authority and little or no argument and, of course, are not reviewable. 24A C.J.S.

Criminal Law § 1813, p. 465; State v. McLachlan, Mo., 283 S.W.2d 487, 489. Point IX in which it is asserted that the trial judge deprived appellant of a fair trial in violation of due process and equal protection in "unduly commenting" in the course of the trial favorably to the state is not only not briefed but refers to an "Appendix" and there instead of an argument are thirty-five (35) references to the transcript—"p. 5, line 18," for example, without explanation or demonstration. Not only does this point not comply with the rules of this court—it is all but meaningless, particularly as a claim of invasion of constitutional rights. State v. Crockett, Mo., 419 S.W.2d 22, 26–27. Some of the instances have been encountered in the course of reading the transcript and as to a few of these the state has pointed out that the court's inquiries were for clarification and in any event not an unpermitted comment on evidence, not prejudicial and certainly not an invasion of constitutional rights. State v. Lay, Mo., 427 S.W.2d 394. Throughout the trial his hired trial counsel (now deceased) and his present lawyer have insisted, often mistaking the appropriate constitutional provision, that every objection, every assignment of error and every point was an invasion of due process and equal protection under both state and federal constitutions and these have not been helpful. As the court said in Wood v. United States, 9 Cir., 405 F.2d 423, 426, "there is not even the most tenuous basis in the record for the serious charges made against the district court." Another point, II, is a claim of denial of constitutional rights in violation of the Sixth and Fourteenth Amendments in that appellant was denied a fair trial and the court erred in refusing his motion to dismiss the jury because of a systematic exclusion of Negroes from both the grand and petit jurors. Here, of course, the appellant invokes the Coleman cases, Coleman v. Alabama, 377 U.S. 129, 84 S.Ct. 1152, 12 L.Ed.2d 190, and Coleman v. Alabama, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22. There is, however, no record proof and support for this assertion, there was only

the objection and statement of appellant's counsel which, of course, "are not evidence of the facts stated in the objection." State v. Roland, Mo., 79 S.W.2d 1050; Wood v. United States, 405 F.2d 1. c. 426, "No evidence was offered to prove that there were legal defects in the method of jury selection." There was no formal challenge to the array and the burden was on the appellant to show purposeful discrimination. Mobley v. United States, 5 Cir., 379 F.2d 768. But her again "The defendant offered no evidence of a systematic exclusion of Negroes from the jury in support of that allegation in his motion. There were Negroes on the panel, and the record so shows. The fact that none were selected to serve on this jury does not tend to prove that the court in summoning prospective jurors did so improperly." State v. Selman, Mo., 433 S.W.2d 572, 577; State v. Ramsey, 355 Mo. 720, 197 S.W.2d 949. Having thus delimited in a measure the issues, the points properly briefed and argued will be considered.

The jury was qualified with a view to the infliction of the death penalty (RS Mo 1959, § 559.260) and another constitutional infringement is claimed in that jurors with conscientious or religious scruples were excused for cause. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. Even though appellant cites the case his argument ignores the fact that the jury did not assess the death penalty: "Our decision in *Witherspoon* does not govern the present case, because here the jury recommended a sentence of life imprisonment." Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797.

Relying on United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, both instances of lineups held in the absence of and without notice to chosen counsel, the appellant contends that the court erred in overruling his objections to all state testimony relating to a lineup. Upon this particular record this question has several facets. But aside from retroactivity and "totality of the circumstances" (Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402) both of which could be explored and ruled against appellant, the argument ignores the record. In testifying in chief Judith said, "I was able to see them. I got good looks at them." As to the appellant she said, "I saw Nathaniel Warters mainly when I was being raped—when he was the first one to take my virginity and rape me and when with his head directly over me, and then when Taggert was raping me—when they were punching me I looked up and there is his head right over me. Now, right there, a very few yards from where I was being raped was a street light which provided a lot of light and I could see them very distinctly * * *. Q. When the rape occurred, then, there was a lighting condition that permitted you to see the individual who raped you, if I understand you correctly? A. Yes. Q. Did you tell the police officer about a description about these individuals? A. Yes. Q. What description did you give of Nathaniel —Nathaniel Warters? A. I said he had rounded hair line, closely cut hair, a very broad nose, very broad lips, and a very small sort of face. * * * and then just plainly shaped eyebrows. Q. (Mr. Williams, defendant's lawyer, interjecting): Did you tell the police officer that? A. Yes, and I thought that from—I never did see any of their legs—but he said just give an estimate—and I thought from just the length of his face that he would be short. He has a very small head." It turned out that Warters was not a short man and she said on cross-examination as to the lineup, "That was what threw me off. I recognized the face, but not the height. Q. Now, you say that when you were being attacked by Number Two man—and I think you said that was Warters? A. Yes. Q. You say he attacked you in sort of a form or fashion that he had his face over your face, so you could *identify* who he was— so you could see his face? A. His face was above my face, not on it. Q. So, you could look right at his face and see who he

was? A. Oh, yes. Q. He didn't try to cover up his face? A. Not during the rape at all." At another point: "Q. And you don't know at any time other than this glimpse that you were able to identify this man? A. No—it was no glimpse. It was a glimpse at the back side door, but it wasn't a glimpse when he was over me raping me and biting me and when he was holding me down and Taggert was raping me. Twice he tried to smother me and I just kept looking up at them and kept jabbing my fingernails into his hand." In Warters' case there was an attempt as in Taggert's (who had a moustache and goatee) case to confuse Judith as to whether he too had a moustache. State v. Taggert, 443 S.W.2d l. c. 175. "On the basis of this evidence, we have no doubt that the in-court identification of the defendant by Mrs. White had an independent basis and did not result from her observation of the defendant in the lineup." State v. Mentor, Mo., 433 S.W.2d 816; State v. Balle, Mo., 442 S.W.2d 35, and State v. Walters, 457 S.W.2d 817.

■ Somewhat related to the lineup assignment of error are his numerous objections to testimony as to his oral confession, reference to it in the opening statement and finally to its admission in evidence. It is urged that the court erred in finding that his oral confession was voluntary and that its admission in evidence falls within the ban of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed. 2d 634 and all the other leading and authoritative cases on this subject. It would serve no useful purpose to point out the distinguishing factors and circumstances of these well-known cases. It should be noted that the defendant in testifying did not claim police brutality, mental coercion or any other form of involuntarily secured oral confession. He said that Chief Zinn offered two years' punishment if he would

turn "state's evidence" but this offer he declined. When he testified on the motion to suppress he testified that for a long period of time he was denied food and drink. He admitted signing the waiver of rights card but he said, "I didn't know anything about any of the questions they asked." And he insisted, "I made no statement to Mr. McNary at all." He says that the only thing he told McNary was that he wanted a lawyer and "I told them I wasn't guilty." Thus his claim of involuntary confession arises in an unusual if not completely untenable posture.

If his position is not so contradictory as to be self-destructive, the indisputable record shows that upon selection of the jury and the completion of the prosecutor's statement there was a hearing before the court "outside the hearing of the jury" on appellant's motion to suppress his oral confession (there was no written or tape-recorded statement). On this motion all the arresting officers and police officials were called and examined in detail. Beginning with the captain of the Webster Groves police department who arrested Warters when he voluntarily appeared at the police station at 2:55 a. m., on February 3, 1967, and ending with all police officers concerned the state's witnesses all said that after Wallace, the police captain, warned him of his right to silence, his right to counsel and that anything he said could be used against him he signed, exhibit one—a waiver of his rights. Thereafter this officer and all others detailed the circumstances in which he was examined, moved to the St. Louis County Police Department in Clayton, refused an offer of an attorney and finally admitted the gang-rape of Judith. Each of the officers detailed his oral confession and finally and with unmistakable clarity the court found that "the confession and statement made by the defendant was voluntarily given."

And then in the hearing of the jury and upon his trial these and other witnesses testified at length to the circumstances in

which Warters admitted the assault and ravishment of Judith. Illustrative of all the witnesses Mr. McNary, prosecuting attorney of St. Louis County, testified that about 1:30 on the morning of February 4, 1967, he went to police headquarters, advised Warters in detail of his constitutional rights "during interrogation," inquired of his understanding and then proceeded to the questioning which led to the appellant's detailing the facts of Judith's ravishment and the part he, Hull and Taggert each played in the crime, including the fact that he took her ring and watch and later gave the watch to Taggert. In the course of his interrogation he was shown the watch which had been retrieved at Taggert's home. The police and Mr. McNary were corroborated in every detail by Mrs. Stoner, the P.B.X. operator at police headquarters who was present throughout the interrogation—led she said by Mr. McNary, and she testified in detail to the circumstances of the interrogation and finally to Warters' detailed admission. It is not necessary to set forth the oral confession or to further detail the circumstances in which it was given—the voluntariness of the confession was submitted to the jury along with instructions on the weight and credibility of witnesses, burden of proof and numerous other cautionary instructions.

In these circumstances and in this background there is obviously no basis for the appellant's numerous assignments of error directed to his oral confession. It may be said in passing that these assignments relate to every phase of the trial, the opening statement of the prosecutor, the hearing on motion to suppress, the testimony of each and every witness, the instructions of the court and the state's argument to the jury. As stated, it is not necessary to point out the distinguishing characteristics of the cases relied on, it is sufficient to say as the Supreme Court of the United States said in Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684, after distinguishing the Escobedo and Miranda cases, "The trial judge, after an evidentiary hear-

ing during which the tape recording was played, could not agree with this contention, *and our reading of the record does not lead us to a contrary conclusion.* * * * The fact that the police misrepresented the statements that Rawls had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible. These cases must be decided by viewing the 'totality of the circumstances,' see e. g., Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967), *and on the facts of this case we can find no error in the admission of petitioner's confession."* See also Pinto v. Pierce, 389 U.S. 31, 88 S.Ct. 192, 19 L.Ed.2d 31; Boulden v. Holman, 385 F.2d 102 (5 Cir.); State v. Taggert, supra.

■ As entitling him to a new trial the appellant urges, again in violation of the Fourteenth Amendment, that the court erred in permitting the state's witnesses to give "irrelevant, immaterial and prejudicial" testimony called "background and preliminary information." In the trial his counsel objected that "any questions with reference to her statistical relationship simply imposes upon this defendant the burden of proving something that isn't in issue— that it also gives the state a right of sentimental journey." And then he objected that testimony as to Judith "where she was and who she is—is statistical and is reputation of her social standing" and violative of defendant's *Fifth Amendment* constitutional rights. There were similar objections throughout Judith's testimony— the court sustained one and ordered stricken her statement that her father had been dead for thirteen years. But the testimony he is objecting to here is Judith's recitation of where she had been, the Municipal Opera, with whom she had gone, a description of her home, her neighbor's home—of all this he objected "they are sentimental in their sentiment, and they are not substantial." The short answer to appellant's complaints is contained in a South Carolina rape case: "Those particular matters were * * * 'a part of the history of the

case.' Even if objection had been made thereto, the substance, at least, of these conversations would have been admissible. The prosecutrix, Sutton and Dickson only testified as to preliminary matters, going to show where the prosecutrix and Sutton (her boyfriend) were, and what was the purpose of their visits. The inquiries for officers on the part of Sutton were preliminary to the matter of giving a report that the crime of rape had been committed. The rule in this state is that evidence otherwise inadmissible may be admitted as preliminary to a relevant inquiry." State v. Floyd, 174 S.C. 288, 177 S.E. 375, 389–390. There is certainly nothing in these particular circumstances denying to appellant his Sixth Amendment right to be confronted with the witnesses against him as in Berger v. California, 393 U.S. 314, 21 L.Ed.2d 508, 89 S.Ct. 540.

■ Another objection asserted to involve equal protection and due process is the admission of exhibits 2 through 8 and 19 through 23. These are all photographs of Judith's home and the garage, of the area through which she was dragged and carried and of the Algonquin Country Club area. A sufficient answer to this assignment of error is another rather similar rape case, State v. Brownridge, Mo., 353 S.W. 2d 715, 718–719: "Nor did the court err in admitting in evidence the large aerial photograph of a section of Forest Park. The photograph was of assistance in aiding witnesses in their descriptions of the occurrences which took place at the scene of the crime and during appellant's flight from the scene." And see State v. Sims, Mo., 395 S.W.2d 445.

■ Another instance and illustration of misplaced reliance on constitutional rights as well as a misunderstanding of basic principles of substantive criminal law has to do with the appellant's objections to the testimony concerning Judith's watch "because it raises another charge." Here appellant relies again on Gilbert v. California and on Specht v. Patterson, 386

U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326. The appellant does not object to Judith's testimony that he and Hull and Taggert bit her, beat her, tore her clothes off and threatened her with a knife—all assaults and separate offenses although employed in consummation of their purpose to ravish her. In Taggert's case there was an unsuccessful objection to testimony relating to Warters and to the introduction in evidence of Judith's clothes. It is not necessary to explore this and related claims, references to his codefendants, in depth. "When a defendant in the course of the perpetration of one crime commits another, the state is not required to nicely sift and separate the evidence and exclude the testimony, tending to prove the crime for which he is not on trial"—it is all a part of one transaction, there testimony by the victim that his kidnappers also robbed him. State v. Sinovich, Mo., 329 Mo. 909, 46 S.W.2d 877. And in a rape case bearing more than a passing resemblance; "When the witness Copeland (the victim's escort) was on the stand, the prosecuting attorney asked him if the defendant got anything from him, and he answered 'he got ten cents.' This is assigned as error, because tending to prove a distinct offense from that charged in the indictment. The answer was clearly admissible, as a part of the res gestae, and in such a case it is not incompetent because it tended to show defendant guilty of robbery as well as rape." State v. Taylor, 118 Mo. 153, 22 S.W. 806.

■ There is an assignment of infringement of constitutional rights in permitting the state to cross-examine appellant "to allegedly test" his credibility. Because some of these questions relating to five other instances of gang rapes occurred when Warters was testifying on his motion to suppress it is sought to bring the case within Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 which involved Fourth not Fourteenth Amendment rights. The first reference to other offenses of rape came, however, in his examination in chief by his own coun-

sel. After denying that he ever saw Judith or that he knew where the Algonquin Country Club was located and after denying signing the waiver or making an admission of any kind to anyone there were these questions and answers: "Q. Did they (police officers) ask you any questions? A. Yes. Q. What was your reply? What were the questions asked you? A. They asked me if I knowed anything about any attack on any people that had happened in the St. Louis County area. Q. And how many attacks did they say had happened? A. He said five. Q. What was your answer? A. I told him I did not know anything about these attacks." In the Simmons case there is this sentence "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt *unless he makes no objection.*" 88 S.Ct. 1. c. 976. Here there was not only no objection the whole matter was voluntarily placed before the jury by the appellant and his counsel and it is indeed difficult to comprehend just how his constitutional rights have been infringed. As indicated in considering another point when the state asked Warters whether he had been "questioned" about the five attacks there was an objection and the court sustained an objection as to "the form of the question."

At that point the prosecutor inquired what Officer Patty had questioned him about and he answered without objection "Armed robbery." He denied that Patty had questioned him about raping Judith. All criticisms of the state's cross-examination, aside from no objections, overlook the fact that Warters elected to testify as was his right but when he did so he was "liable to cross-examination, as to any matter referred to in his examination in chief, *and may be contradicted and impeached as any other witness in the case.*" RSMo 1959, § 546.260, V.A.M.S. And as a witness and as bearing on his credibility he was subject to being asked embarrassing discrediting questions. State v. Blocker, Mo., 278 S.W. 1014; State v. Scown, Mo., 312 S.W.2d 782.

 Another claim of invasion of constitutional rights concerns the state's two rebuttal witnesses, Chief Zinn and Captain Wallace. Chief Zinn denied that he had told appellant that if he would turn state's evidence he would recommend two years' imprisonment. Wallace was called to establish that Warters was not denied food but objection was sustained as to virtually every question and upon this record there was no abuse of discretion. State v. Arrington, 375 S.W.2d 1. c. 195. Likewise there was no abuse of discretion in permitting the state on October 9, 1967, and again on November 22, 1967, to endorse prior to trial beginning on December 4, 1967, the names of additional witnesses, most of them police officers, several of whom testified on appellant's motion to suppress before testifying upon the trial on its merits. State v. Hartwell, Mo., 293 S.W.2d 313, 316–317.

 A final point extensively argued as infringing due process and equal protection is that by giving instructions 1 through 9 he was deprived of a fair and impartial trial in that they are "contrary to the competent evidence adduced and the law which they purport to state." It is urged among other arguments that the main instruction, No. 1, constitutes a variance. The definitions of terms are all objected to. It is urged that instruction 2 is prejudicial, all persons are equally guilty who act together with a common intent in the commission of a crime. It is not proposed to further encumber this opinion with a discussion of the nine instructions, the ninth one telling the jury that they could not return a verdict "unless all twelve jurors concur and agree to the same." It is sufficient to say that all nine instructions and the court's introductory instruction as to the duties of jurors in general (MAI 2.01) are all attacked in appellant's motion for a new trial and here. In its brief the state has cited a list of cases supporting each of the given in-

structions and to this list has been added where it could be found a rape case involving the particular instruction. This point will be disposed of by the citation of a single case in support of each numbered instruction 1 to 9. Instruction 1 on forcible rape, State v. Deckard, Mo., 426 S.W.2d 88, and State v. Arrington, 375 S.W.2d 1. c. 194; number 2, State v. Valle, 164 Mo. 539, 65 S.W. 232, number 3 on alibi, State v. Arrington, supra, and State v. Hillebrand, 285 Mo. 290, 225 S.W. 1006; number 4 on voluntary confession, State v. Adams, Mo., 380 S.W.2d 362 (a rape case); number 5, State v. Turner, Mo., 320 S.W.2d 579; number 6, State v. Butler, Mo., 310 S.W.2d 952; instructions 7 and 8 on remarks of counsel, State v. Hodge, Mo., 399 S.W.2d 65, 69, and 23A C.J.S. § 1297, p. 721 and, finally, on the necessity of a unanimous verdict, State v. Hale, Mo., 371 S.W.2d 249, 257–258, and State v. Grant, Mo., 394 S.W.2d 285, 289.

Upon this record there was no manifest, prejudicial error in any of the respects asserted and accordingly the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

MORGAN, J., concurs; FINCH, J., concurs in separate concurring opinion filed and DONNELLY, P. J., concurs and concurs in separate concurring opinion of FINCH, J.

FINCH, Judge (concurring).

I concur in the principal opinion in all respects except its disposition of the issue as to the lineup, and with respect to that question, I concur in the result reached.

The appellant cites and relies on United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926,

18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178. However, those cases are not retrospective in application. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. Wade and Gilbert were decided June 12, 1967. The lineup in this case was held on February 3, 1967. Consequently, Wade and Gilbert are inapplicable and I would rule the case on that basis.

Under such circumstances, the question is whether the lineup in this case "was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." Stovall v. Denno, supra, 388 U.S. 1. c. 301, 87 S.Ct. 1. c. 1972; Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402. I agree that the in-court identification by prosecutrix had an independent source and I am of the view that the lineup in this case was not "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny defendant herein due process of law.